[No. S046117. Mar. 17, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST DWAYNE JONES, Defendant and Appellant.

COUNSEL

H. Mitchell Caldwell and Jan J. Nolan, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BROWN, J.—A jury convicted defendant Ernest Dwayne Jones of the first degree murder (Pen. Code,[1] §§ 187, 189) and rape (§ 261) of Julia Miller, and it found true the special circumstance allegation that the murder was committed in the commission of the rape. The jury found that defendant was not guilty of burglary (§ 459) or robbery (§ 211) of Mrs. Miller, and it found not true the special circumstance allegations that the murder of Mrs. Miller was committed in the commission of burglary or robbery. Finally, the jury found true the allegations that defendant personally used a deadly weapon, i.e., a knife, to commit the crimes (§ 12022, subd. (b)) and that he had served a prior prison term (§ 667.5). The jury set the penalty at death. The trial court denied defendant's motion for a new trial (§ 1179 et seq.) and his

---

[1]All further statutory references are to the Penal Code unless otherwise designated.

motion for modification of the sentence (§ 190.4, subd. (e)). This appeal is automatic. (§ 1239.)

We conclude the judgment should be affirmed in its entirety.

## I. FACTS

### A. *Guilt Phase*

#### 1. *The People's Case*

Shortly after midnight on August 25, 1992, in Los Angeles, Chester Miller returned home from work and noticed the family station wagon was missing from the driveway. Mr. Miller went into his house and found his wife, Julia, lying dead at the foot of their bed. Mrs. Miller's robe was open, her nightgown was bunched above her waist, and she was naked from the waist down. A telephone cord and a purse strap had been used to tie Mrs. Miller's arms over her head, and a nightgown had been used to loosely tie her ankles together. Mrs. Miller had been gagged with two rags, one in her mouth and another around her face. Two kitchen knives were sticking out of her neck. Pieces of three other knives were found on or around her body.

Defendant and the Millers' daughter, Pam, lived together in an apartment about two and one-half miles from the Millers. Around 6:00 p.m. on the previous day, August 24, 1992, Pam had been on the phone with her mother. Defendant had interrupted Pam to ask her whether her parents were at home. Pam told defendant that her father was at work, but that her mother was home.

Around 7:40 p.m. the same evening, defendant left the apartment. Pam later noticed defendant had apparently switched off the ringer on their phone, something he had never done before. At 9:30 p.m., defendant re-turned to the apartment, smoked a joint of marijuana and cocaine, and then left again at 10:00 p.m. He had again switched off the phone ringer. Defendant returned in 20 minutes and rolled some more "joints."

Pam always slept with the television on, but this night defendant told her to turn it off because he had things on his mind. Around midnight she woke up and saw defendant looking out the window. At some point in the evening he had changed clothes. At 1:00 a.m., their doorbell rang. Defendant told Pam not to answer it. Hearing her name called, Pam looked out of the bedroom window and saw her grandmother, who told her to open the apartment door. When defendant did so, Pam's grandfather said her mother

had been killed. Pam repeatedly asked defendant to accompany her to her grandparents' house, but defendant refused, saying he would come when he got his sister's car.

When Pam arrived at her grandparents' house, she called her friend Shamaine Love. Pam told Love that Mrs. Miller had been killed. Love, a childhood friend of Pam's, as well as a drug dealer who regularly sold cocaine to her and to defendant, lived near Mr. and Mrs. Miller. Love told Pam that several times during the day Mrs. Miller had been murdered defendant had been to Love's house to buy drugs from her. Two of defendant's trips to Love's house were in the afternoon; on both occasions he paid for the drugs in cash. Shortly after sunset, which would have been sometime between 7:30 and 7:55 p.m., defendant had again visited Love, this time paying for cocaine and marijuana with a gold chain. Later that night defendant again bought cocaine from Love, paying for it with a pearl necklace, pearl earrings, and a pearl bracelet. Pam identified the pearl jewelry, and later the gold chain, as Mrs. Miller's. Pam took the pearl jewelry to the Miller house and showed it to detectives there. Pam told the officers that she knew who had killed her mother and that they should go to the apartment.

At 3:00 a.m., police officers staked out the Millers' station wagon, which they found parked around the corner from the apartment. Shortly thereafter defendant got into the station wagon and drove away. The officers followed in their marked patrol car. Defendant looked back in the officers' direction, reached into the backseat, and brought a rifle into the front seat. Defendant then sped up, and the officers gave chase, their lights and sirens on. Defendant ran red lights and stop signs. Other patrol cars joined in pursuit. Defendant hit a traffic island and blew out the tires on the driver's side of the station wagon. He continued driving on the rims, however, and entered a freeway. First the wheels and then the rims on the station wagon disintegrated, forcing defendant to stop. The pursuit lasted 40 minutes. Defendant was ordered out of the station wagon, but instead he placed the rifle to his chest and shot himself. A subsequent search of the apartment revealed that the front and back doors had been barricaded with furniture.

The deputy medical examiner with the Los Angeles County Coroner's Office who performed the autopsy on Mrs. Miller's body concluded, on the basis of the following evidence, that she had been stabbed to death. Two knives were sticking out of Mrs. Miller's neck. She also had 14 stab wounds in her abdomen and one in her vagina, but the fatal stab wound, which penetrated to the spine, was the one in the middle of her chest. Aside from the stab wound, there was no evidence of trauma to the vaginal region.

At the crime scene, a criminalist with the Los Angeles County Coroner's Office took swabs of Mrs. Miller's vagina. Another criminalist found a great

abundance of intact spermatozoa on the vaginal swab, leading him to conclude that ejaculation occurred no more than five to 10 hours before Mrs. Miller's death. A blood sample was taken from defendant. A molecular biologist for Cellmark Diagnostics performed deoxyribonucleic acid (DNA) testing on the blood sample taken from defendant and on the vaginal swabs taken from Mrs. Miller. This testing yields *banding patterns* that are, with the exception of identical twins, unique to every individual. There is only one chance in 78 million that a random individual would have the same DNA banding pattern as defendant. The tests showed that the banding pattern in the DNA from defendant's blood sample matched the banding pattern of the semen on the vaginal swab taken from Mrs. Miller.

*Defendant's prior conviction for sexually assaulting Dorothea H.*

Previously, defendant had lived with Glynnis H. and their infant son in a garage behind the home of Glynnis's mother, Dorothea H. (Mrs. H.). After defendant and Glynnis broke up and Glynnis moved away, Mrs. H. told defendant to move out of the garage. On March 29, 1985, around 6:30 a.m., Mrs. H. heard the gate to her backyard rattle and then heard a window in the bedroom nearest the garage, the bedroom Glynnis had used, break. Mrs. H. investigated and found defendant standing in her hallway. Appearing desperate, defendant asked Mrs. H. where Glynnis and the infant were. When he learned they were not there, defendant, telling her not to scream, took Mrs. H. into her bedroom. Defendant gagged Mrs. H. and bound her arms and legs. The binding permitted Mrs. H.'s legs to be separated a bit. Defendant then raped and sodomized her.

After the assault, while defendant was resting on the bed, the doorbell rang. After peeking outside, defendant untied Mrs. H., told her not to say anything, and stood behind her as she opened the door. It was a delivery from the United Parcel Service—a package from Glynnis containing a photograph of Glynnis, defendant and their infant. When he saw the photograph, defendant began crying. He told Mrs. H. he was not going to kill her because Mrs. H., who was a teacher, could take care of the baby financially.

Defendant then took a knife from the kitchen drawer, placed it against his stomach, and asked Mrs. H. to kill him. When Mrs. H. said she couldn't, that it would be against her religion, defendant bound her to her bed, took $40 dollars from her purse, and asked her for her neighbor's phone number, saying that after he left he would call her neighbor. Defendant did so, and the neighbor released Mrs. H.

As a result of this incident, defendant was convicted of first degree burglary (§§ 459, 460, subd. (a)), residential robbery (former § 213.5, repealed by Stats. 1986, ch. 1428, § 5, p. 5124; see now § 213), assault with a

deadly weapon (§ 245, subd. (a)(1)), rape (§ 261, subd. (a)(2)), and sodomy (§ 286, subd. (c)(2)). In April 1986, defendant was sentenced to prison for 12 years, and he was paroled in 1991, 10 months before the murder of Mrs. Miller.

### 2. The Defense Case

Defendant testified as follows: Around 3:00 p.m. on the day he killed Mrs. Miller, defendant, feeling depressed, bought rock cocaine and marijuana from Shamaine Love, paying $20 in cash. He went to the apartment and smoked some of the drugs, and not having used drugs for seven years, became very high and paranoid. Pam came home to the apartment around 5:30 p.m. She was also high on drugs. Giving defendant a gold chain, pearl necklace, pearl earrings, and a pearl bracelet, Pam told defendant to use the jewelry to buy drugs from Shamaine Love. Defendant had seen Pam with Mrs. Miller's jewelry before, but he did not recognize this jewelry as belonging to Mrs. Miller. After Pam spoke on the phone with her mother, defendant took the bus to Shamaine Love's house, arriving around 7:30 p.m., and bought cocaine from her, paying $125 in cash plus the jewelry.

After waiting at a bus stop for 30 or 40 minutes, defendant decided to walk to the Millers' nearby home and ask Mrs. Miller for a ride back to the apartment. He did so for two reasons: He was feeling the effects of the drugs and liquor he had consumed throughout the day, and Love had told him police were patrolling the neighborhood. Mrs. Miller invited defendant into her house and agreed to give him a ride to the apartment.

A few weeks earlier, defendant had broken his thumb in six places. Defendant had previously given Mrs. Miller a more innocuous explanation—that he had broken it in the course of horseplay with Pam—but now Mrs. Miller asked him how he had really broken it. Defendant admitted that when Pam had come home late one night, he had confronted her, she had walked away from him, and he had grabbed at her waist and missed, jamming his thumb into the door frame.

Upon hearing this, Mrs. Miller became very angry. She told defendant she would kill him if he hurt Pam, and that she would lie to his parole officer to get him sent back to prison, a threat she had made on a previous occasion. Mrs. Miller took a knife from the kitchen drawer. Defendant pushed her. "You bastard," Mrs. Miller said, "My husband don't put his hands on me." As Mrs. Miller came at defendant with the knife, defendant responded by grabbing a knife out of the kitchen drawer himself. Defendant told Mrs. Miller he did not want to hurt her. Mrs. Miller swung at defendant with her

knife, missing him. Defendant swung back at her, cutting her arm. "Just wait until I get my gun," Mrs. Miller said, running to her bedroom. Defendant followed Mrs. Miller and as she was taking a rifle out of the bedroom closet, defendant grabbed her from behind and spun her around. Mrs. Miller lost her grip on the rifle and fell to the floor. As defendant stood over her, Mrs. Miller said, "Give it to me."

Defendant then "kind of slipped back into [his] childhood" and had a vision of walking into a room where his mother was with a man "who wasn't [his] father." He picked up a knife and began stabbing Mrs. Miller. The next thing defendant knew he was curled up in a ball, crying, and Mrs. Miller was tied up on the floor with knives sticking out of her neck. Defendant remembered nothing after the first few stabs, but he admitted that he must have been the one who tied Mrs. Miller up, sexually assaulted her, and killed her. He insisted he had not come to the Miller house with the intention of robbing, raping, or killing Mrs. Miller.

After the killing, defendant "started experiencing things that [he] had not experienced for a while." He was "hearing . . . things in [his] head telling [him] to do certain things. [He] guess[ed] you could call it paranoia, thinking someone was coming to kill [him]." He grabbed a second rifle and bullets from the bedroom closet with the intention of taking his life. Defendant drove the Millers' station wagon to the apartment and parked around the corner, leaving the rifle in the station wagon. He locked all the windows and doors in the apartment, believing someone was coming to kill him, yet he went outside later to smoke some of the drugs he had purchased from Shamaine Love. When Pam's grandparents informed her of Mrs. Miller's death, and she left with them, defendant barricaded the doors of the apartment.

When defendant left the apartment he intended to drive the station wagon off a cliff and kill himself. Following the police chase, after the station wagon was disabled, a voice inside his head said, "They're going to kill you." Defendant then put the rifle to his chest and pulled the trigger. He was hospitalized for three weeks, recovering from the wound, and for the first week he was unconscious and on a respirator.

With regard to his prior conviction for sexually assaulting Mrs. H., defendant testified he was "not denying any of that."

B. *Penalty Phase*

1. *The People's Case*

Mr. and Mrs. Miller were married for 30 years, and he died eight months after Mrs. Miller was murdered. In Pam's opinion, Mr. Miller "grieved himself to death."

Gloria Hanks, defendant's sister, testified that defendant told her he "didn't give a fuck about Pam or her family."

During the entire year they lived together, defendant did not tell Pam he heard voices; he did not, in Pam's opinion, act like someone who was hearing voices; and he did not display such behavior when he returned to the apartment after killing Mrs. Miller.

### The rape of Kim J.

On May 28, 1984, Kim J. attended a barbecue party given by defendant's sister, Gloria Hanks. Kim and defendant smoked marijuana together at the party, and then they went to Kim's house and smoked some more. Kim considered defendant to be like a brother. However, when she suggested it was time for him to leave, defendant grabbed her by the throat, told her he would kill her if she screamed, and then raped her at knifepoint. While defendant was attacking Kim "he seemed to be in a trance. His eyes got big and glassy and his whole demeanor changed. [¶] It was like he took on a new person, like he was in a trance, and then afterwards, he seemed to snap back." Defendant apologized and asked Kim whether she was going to tell anyone. She said she would not, but later, urged by her mother to do so, Kim called the police. She testified against defendant at a preliminary hearing, but then dropped the charges because she had known defendant "practically all of his life" and she was "best friends with two of his sisters." "[F]or whatever reason I was thinking he needs a second chance."

### 2. The Defense Case

In the words of an aunt, defendant's home life was a "living hell." Defendant's father and mother were alcoholics. They also used marijuana in front of their children. The father and mother had "pretty rough fights" with one another, and on one occasion the mother stabbed the father in the hand. The mother had numerous affairs. Once, the father caught the mother in bed with one of the father's friends, and defendant and his sister were in the bed at the time. After that incident, the father began beating the mother and "stomped her in her vagina." When the father left the family, the mother and her boyfriend drank heavily and often the family had no money for food. The mother beat the children. "Whatever she had in her hands, she might hit them with it." In defendant's presence, defendant's mother told his father that defendant was not in fact his child.

In the opinion of James Park, a corrections consultant and retired Department of Corrections employee, defendant was likely to be a good prisoner

and unlikely to become involved in violence. Mr. Park based his opinion on the following factors: Younger prisoners are more likely to be violent, and at 30, defendant was older; during his previous eight-year prison term, defendant had relatively few infractions, and only one for fighting; finally, defendant had completed the requirements for a high school degree.

In the opinion of Dr. Claudewell S. Thomas, a psychiatrist appointed by the court at the request of the defense, defendant suffered from schizoaffective schizophrenia, a major psychiatric disorder. In reaching his diagnosis, Dr. Thomas interviewed defendant and reviewed various documents: a 1985 report by a psychologist concluding that defendant's mental processes were intact and he was not psychotic; a 1985 report by a psychiatrist concluding defendant suffered from a chronic underlying depressive mental illness exacerbated by alcohol and drug abuse; a report by a psychologist who examined defendant in 1994 concluding that defendant was schizophrenic.

## II. DISCUSSION

### A. *Pretrial Issues*

#### 1. *Marsden Motion*

Pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44] (*Marsden*), defendant moved to have substitute trial counsel appointed. Defendant contends the trial court failed to conduct an adequate inquiry into the grounds for the motion before denying it. The court's inquiry was adequate, and it did not abuse its discretion in denying the motion.

In *Marsden*, we said: "[A] judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney. A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.' (*Spector v. Superior Court* (1961) 55 Cal.2d 839, 843 [13 Cal.Rptr. 189, 361 P.2d 909].)" (*Marsden, supra,* 2 Cal.3d at p. 124.)

A defendant is entitled to have appointed counsel discharged upon a showing that counsel is not providing adequate representation or that counsel and defendant have become embroiled in such an irreconcilable conflict that

ineffective representation is likely to result. (*People v. Earp* (1999) 20 Cal.4th 826, 876 [85 Cal.Rptr.2d 857, 978 P.2d 15] (*Earp*); *People v. Memro* (1995) 11 Cal.4th 786, 857 [47 Cal.Rptr.2d 219, 905 P.2d 1305] (*Memro*).)

 In this case, defendant interrupted pretrial proceedings to declare a conflict of interest with counsel. The court construed defendant's remarks as a *Marsden* motion, and defendant was given an adequate opportunity, before the court ruled on his motion, to explain why he was dissatisfied with his attorney.

Defendant stated the following grounds for the motion: (1) Defendant and counsel were not "getting along"; (2) counsel did not visit defendant prior to an earlier hearing in municipal court; (3) counsel did not do everything on the "long list" of tasks defendant had assigned him; and (4) counsel believed defendant guilty, as was evidenced by his discussion of a possible plea bargain.

Defense counsel addressed each of defendant's complaints: (1) Although defendant and counsel had had some disagreements, counsel saw "no reason" why he could not continue to represent defendant; (2) defendant was in local custody and counsel had visited him on "numerous occasions"; (3) counsel had prepared "lengthy and detailed investigations requests," and counsel had informed defendant that he would visit defendant the following week "to cover any areas that were not covered in the requests"; and (4) counsel had discussed possible sentences with defendant at defendant's request, but no offer of a plea bargain had been made by the prosecution.

At the conclusion of the hearing, the court denied the *Marsden* motion. Defendant continued to express his dissatisfaction with counsel; he would be "happy," defendant said, if the court would appoint the lawyer of his choice to represent him. The court explained to defendant that "[i]t doesn't work that way."

 We review a trial court's decision declining to relieve appointed counsel under the deferential abuse of discretion standard. (*People v. Silva* (2001) 25 Cal.4th 345, 367 [106 Cal.Rptr.2d 93, 21 P.3d 769]; *Marsden*, *supra*, 2 Cal.3d at p. 123.) No abuse of discretion has been shown here, as defendant failed to demonstrate either inadequate representation or irreconcilable conflict. (*Earp*, *supra*, 20 Cal.4th at p. 876.) "To the extent there was a credibility question between defendant and counsel at the hearing, the court was 'entitled to accept counsel's explanation.' (*People v. Webster* [(1991)] 54 Cal.3d [411,] 436 [285 Cal.Rptr. 31, 814 P.2d 1273].)" (*People v. Smith* (1993) 6 Cal.4th 684, 696 [25 Cal.Rptr.2d 122, 863 P.2d

192].) If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law. (*Memro, supra,* 11 Cal.4th at p. 857; *People v. Berryman* (1993) 6 Cal.4th 1048, 1070 [25 Cal.Rptr.2d 867, 864 P.2d 40] (*Berryman*), overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

### 2. *Excusal of Prospective Jurors*

■ Defendant contends that the trial court erred in sustaining the prosecutor's challenges for cause to two prospective jurors based on their views with regard to the death penalty, and that this error violated defendant's right to an impartial jury under the Sixth and Fourteenth Amendments to the federal Constitution.

■ The United States Supreme Court has held that a prospective juror may be excluded for cause without compromising a defendant's rights under the Sixth and Fourteenth Amendments to trial by an impartial jury if the juror's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841], fn. omitted; see *Darden v. Wainwright* (1986) 477 U.S. 168, 175-178 [106 S.Ct. 2464, 2468-2470, 91 L.Ed.2d 144].) We apply the same standard to claims under our state Constitution. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1146 [36 Cal.Rptr.2d 235, 885 P.2d 1] (*Rodrigues*); *People v. Guzman* (1988) 45 Cal.3d 915, 955 [248 Cal.Rptr. 467, 755 P.2d 917] (*Guzman*).) A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1114 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *Rodrigues,* at p. 1146.)

Generally, the qualifications of jurors challenged for cause are matters within the wide discretion of the trial court, seldom disturbed on appeal. (*Rodrigues, supra,* 8 Cal.4th at p. 1146; *People v. Kaurish* (1990) 52 Cal.3d 648, 675 [276 Cal.Rptr. 788, 802 P.2d 278].) There is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. (*Wainwright v. Witt, supra,* 469 U.S. at p. 424; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1035 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *Guzman, supra,* 45 Cal.3d at p. 954.) Rather, it is sufficient that the trial

judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror. (*Rodrigues*, at p. 1147; *People v. Hill* (1992) 3 Cal.4th 959, 1003 [13 Cal.Rptr.2d 475, 839 P.2d 984].) "On review, if the juror's statements are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding. If there is no inconsistency, we will uphold the court's ruling if it is supported by substantial evidence. [Citations.]" (*People v. Carpenter* (1997) 15 Cal.4th 312, 357 [63 Cal.Rptr.2d 1, 935 P.2d 708] (*Carpenter*).)

██ Defendant challenges the excusal of Prospective Jurors U. and R. While U. ultimately stated, in response to a question from defense counsel, that he could vote to impose the death penalty "in the right case," U. earlier gave sharply conflicting statements,[2] and so the trial court's determination of U.'s state of mind, i.e., that U. would be *substantially impaired* in the performance of his duties as a juror in this case, is binding on us. (*Carpenter*, *supra*, 15 Cal.4th at p. 357.)

By contrast, almost all of Prospective Juror R.'s answers to the questions asked in the juror questionnaire and on voir dire with regard to his views on the death penalty were entirely unexceptionable.[3] Only two of his answers were problematic, and R. claimed that he had been confused when he gave those answers. Nevertheless, the trial court excused him, finding that he was substantially impaired. The court did so because it did not find R.'s explanations credible. Based on R.'s "body language," on "something that doesn't come out in the transcript," the court concluded R. was tailoring his answers to stay on the jury.

Both of R.'s problematic statements had to do with the standard of proof to which he would hold the prosecution, i.e., whether he would require defendant's guilt to have been proven to an absolute certainty before he

---

[2] For example, in his juror questionnaire, U. stated he was "[a]gainst capital punishment," and, in response to a follow-up question, U. stated he would "always vote for life without parole and reject death" if a defendant were "found guilty of intentional, deliberate first degree Murder and at least one of the 'special circumstances' were found to be true."

[3] R. indicated on the juror questionnaire that he strongly disagreed with the statement that anyone who intentionally kills another should *never* get the death penalty, explaining that the propriety of imposing the death penalty depended on the events leading up to and surrounding the killing. At the beginning of the voir dire, R. responded affirmatively when asked by the court whether he felt that "the death penalty has a place in our society today as a punishment for special circumstance Murder." R. again responded affirmatively when asked by the court whether he could personally impose the death penalty if he felt it was factually warranted. R. also responded affirmatively when asked by the court whether, in a case involving murder in the course of forcible rape, burglary and robbery, he could vote for either the death penalty or life imprisonment without possibility of parole, depending on the evidence.

would vote to impose the death penalty. On the juror questionnaire, in response to a question with regard to his "general feelings" concerning the death penalty, R. stated that it should be imposed only when there is "no doubt" as to a defendant's guilt. However, in response to a follow-up question asked by the prosecutor on voir dire, R. sought to clarify that statement by saying that he understood that the prosecutor's burden in the guilt phase of the trial would be proof beyond a *reasonable* doubt, and that he further understood that proof beyond a reasonable doubt did not mean proof beyond all possible doubt.

The following colloquy then occurred:

"[Prosecutor]: Now, would you require at the penalty phase before you brought in a verdict of death[,] would you require absolute certainty that the defendant committed the crime?

"[Prospective Juror R.]: Could you rephrase that again?

"[Prosecutor]: Yes, certainly. I know it's kind of confusing and I know it's the first time you have been confronted with this. [¶] But the guilt phase is the proof beyond a reasonable doubt stage. . . . In [the] penalty phase, as the judge indicated to you, we don't give you a standard of proof. It's more open-ended than that. . . . And we tell you and the other 11 jurors to go back and discuss the case and come out and tell us your recommendation of death or life without the possibility of parole. [¶] My question to you is: Before you return a verdict of death, would you require that I as the prosecutor prove my case beyond all possible doubt as you've indicated— appear to indicate here?

"[R.]: Yes.

"[Prosecutor]: Would you require that?

"[R.]: Yes.

"[Prosecutor]: Okay. Thank you very much."

In response to follow-up questions by defense counsel, R. said that he understood "that it's impossible to absolutely prove anything. That's why the word reasonable comes in."

At the conclusion of voir dire, the court observed: "I am a little confused now because as to the questions of one attorney you've given an answer one

way and [to] the questions of the other attorney you have given just the opposite [answer]. [¶] In answer to the prosecutor's question, you said you would require in order to return a death verdict . . . that the person's guilt be proved to an absolute certainty.

"[R.]: When he asked me that question, I was thinking he meant . . . beyond a reasonable doubt. The terminology is a little confusing, to tell you the truth.

"The court: It certainly is.

"[R.]: I am trying to understand, give you the honest answer that I feel, but it's a little confusing to me.

"The court: All right. Keeping in mind that nothing can be proved to an absolute certainty.

"[R.]: Right.

"The court: Are you saying that even though you are not convinced to an absolute certainty of someone's guilt that you still could[,] if the facts warranted it[,] you could return the death penalty?

"[R.]: Yes."

The prosecutor then challenged R. for cause, arguing that R. was substantially impaired, that he had indicated he would require proof to an absolute certainty before he would return a death penalty verdict, and that his explanations to the contrary simply showed that he was "savvy enough" to give answers he thought would keep him on the jury.

The court accepted the prosecutor's argument and excused R. "My feeling is he got dragged back across the line. Quite frankly, I have the feeling from the body language[,] the way the questions were answered[,] something that doesn't come out in the transcript[,] that he was trying to tailor his answers to come out with the correct answers. I am going to sustain the challenge of substantial impairment."

The explanations that Prospective Juror R. offered for his conflicting and problematic answers may well have been entirely sincere. However, "[o]n review, if the juror's statements are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding." (*Carpenter, supra,* 15 Cal.4th at p. 357.) It is sufficient that the trial judge is left with the definite

impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror. (*Rodrigues, supra,* 8 Cal.4th at p. 1147; *People v. Hill, supra,* 3 Cal.4th at p. 1003.) No error appears in the excusal of R.

## B. Guilt Phase Issues

### 1. Kelly Hearing

■ Defendant's next assignment of error is related to a question we decided in *People v. Venegas* (1998) 18 Cal.4th 47 [74 Cal.Rptr.2d 262, 954 P.2d 525] (*Venegas*). In *Venegas,* "we recognized the general scientific acceptance of restriction fragment length polymorphism (RFLP) analysis as a means of comparing the DNA in a known sample (e.g., blood from a suspect) with the DNA in a questioned sample (e.g., blood or semen taken from a crime scene). *Venegas* further found general scientific acceptance of the modified ceiling principle, recommended for use by the National Research Council (NRC) in 1992,[4] as a forensically reliable method of calculating the statistical probabilities of a match between the evidentiary samples and the DNA of an unrelated person chosen at random from the general population. We determined that calculations made under the modified ceiling approach—which modifies the product rule[5] in such a way as to select random match probability figures most favorable to the accused from the scientifically based range of probabilities—qualify for admission under the *Kelly* test.[6] (*Venegas, supra,* 18 Cal.4th at pp. 84-90.)" (*People v. Soto* (1999) 21 Cal.4th 512, 514-515 [88 Cal.Rptr.2d 34, 981 P.2d 958] (*Soto*).)

In this case, in ruling on the question whether the prosecution had carried its burden under *Kelly, supra,* 17 Cal.3d at page 30, of establishing that RFLP analysis and the modified ceiling principle were generally accepted in

---

[4] "See National Research Council (1992) DNA Technology in Forensic Science (hereafter 1992 NRC Report) at pages 91-93."

[5] "The product rule states that the probability of two events occurring together is equal to the probability that the first event will occur multiplied by the probability that the second event will occur. (See Kaye, *DNA Evidence: Probability, Population Genetics, and the Courts* (1993) 7 Harv. J.L. & Tech. 101, 127-128 (hereafter Kaye, *DNA Evidence*); Freund & Wilson, Statistical Methods (1993) p. 62.) Coin-tossing is illustrative—the probability of two successive coin tosses resulting in 'heads' is equal to the probability of the first toss yielding heads (50 percent) times the probability of the second toss yielding heads (50 percent), or 25 percent. (See Johnson, Elementary Statistics (4th ed. 1984) p. 143.)"

[6] "See *People v. Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*) and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 [54 App.D.C. 46, 34 A.L.R. 145] . . . . In *Daubert* v. *Merrell Dow* (1993) 509 U.S. 579 [113 S.Ct. 2786, 125 L.Ed.2d 469], the high court held, as a matter of federal jurisprudence, that *Frye* had been superseded by the Federal Rules of Evidence. The foundational requirement for admission of new scientific evidence in California is now referred to as the *Kelly* test or rule. (*People v. Leahy* (1994) 8 Cal.4th 587, 612 [34 Cal.Rptr.2d 663, 882 P.2d 321].)"

the scientific community, the trial court, at the request of the prosecution, took judicial notice of, among other things, the testimony given by an expert witness, Dr. Patrick Michael Conneally, in an earlier, unrelated trial in the same county (Los Angeles). This, defendant contends, was error. In making a *Kelly* ruling, defendant argues, a trial court may not, consistent with the hearsay rule and the constitutional right of confrontation, take judicial notice of expert testimony given in another case.

We need not reach the question whether it is error for a trial court to take judicial notice, over objection, of an expert's testimony in another *Kelly* hearing, for any error in this regard was clearly harmless here.

First and foremost, the trial court's conclusion—that RFLP analysis and the modified ceiling principle were generally accepted in the scientific community by the time the hearing was held in this case—was correct. In *Venegas*, we held that RFLP analysis and the modified ceiling principle were generally accepted in the scientific community in 1992, when the trial court in that case made its *Kelly* ruling (*Venegas, supra,* 18 Cal.4th at p. 57), and this case was tried two years later. Second, when the trial court granted the prosecution's motion that it take judicial notice of Dr. Conneally's testimony in the earlier case, the grant was expressly conditioned on defendant's having an opportunity to call and cross-examine Dr. Conneally. Defendant chose not to take advantage of that opportunity. Therefore, defendant effectively waived the confrontation issue. Finally, had the trial court declined to take judicial notice of Dr. Conneally's testimony in the earlier case, and thus forced the prosecution to call him in this case, there is no reason to believe his testimony would have differed in any significant respect from his earlier testimony. Defense counsel apparently came to that conclusion for he declined the trial court's invitation to call Dr. Conneally and cross-examine him.

Defendant contends he received ineffective assistance of counsel because his counsel did not call live witnesses to refute the expert *Kelly* testimony that was given in the other case and judicially noticed in this case. Defense counsel gave a coherent explanation as to why he chose not to call live witnesses—he was satisfied that the evidence already in the record adequately demonstrated a lack of consensus in the scientific community. (We reiterate that this case was tried four years before we held in *Venegas, supra,* 18 Cal.4th 47, that RFLP analysis and the modified ceiling principle were generally accepted in the scientific community.) Accordingly, defendant's ineffective assistance of counsel claim lacks merit. (See *People v. Bolin* (1998) 18 Cal.4th 297, 334 [75 Cal.Rptr.2d 412, 956 P.2d 374] [whether to call certain witnesses is a matter of trial tactics, unless the decision results from unreasonable failure to investigate].)

The remaining arguments defendant makes with regard to the *Kelly* question also lack merit.

Defendant contends the trial court "candidly admitted that it had not even read" the 1992 NRC Report.[7] To the contrary, the record reveals the court had reviewed the report before making its ruling.

Defendant contends the trial court did not understand that in a *Kelly* hearing, the prosecution has the burden of proving that a new scientific technique has gained general acceptance in a particular field. The source of the confusion here was the trial court's statement that it would "bifurcate" the *Kelly* hearing, looking first to the evidence offered by the prosecution to see whether, standing on its own, it demonstrated the requisite general acceptance, and then the burden would shift to the defense to rebut that evidence. However, as the Attorney General points out, the court clarified that it did not mean that "in any way I feel the burden has shifted to the defendant. The burden has always been [on] the People." Rather, by bifurcating the process, the court was merely trying to expedite it, by pointing out if the prosecution had failed to make a prima facie case as to general acceptance, there would have been "no need for the defense to go any further." However, having concluded that the prosecution had carried its burden of proving general acceptance, the court wished the defense to understand that, "[f]rom a practical standpoint, you are faced with a situation of going forward or losing the issue."

## 2. *Exclusion of Defense Evidence*

■ Defendant contends the trial court erred by precluding him from testifying that he "had an extensive history of hearing voices, flashbacks, and blackouts." The testimony he was precluded from giving would have been critical, defendant asserts, to the question whether he was capable of forming the specific intent to rape Mrs. Miller. (See *post*, at p. 1257.) Without the precluded testimony, defendant contends, the testimony he was permitted to give—that he experienced similar symptoms when he murdered Mrs. Miller—appeared "both contrived and fabricated, and as such was likely dismissed by the jury." Therefore, defendant argues, preclusion of the testimony violated his Fifth, Sixth, and Fourteenth Amendment rights by "den[ying] him the opportunity to present a complete defense to the capital charge."

Defendant's proposed testimony with regard to his alleged history of hearing voices, experiencing flashbacks, and suffering blackouts was

---

[7]See footnote 4, *ante.*

jumbled deep inside an extraordinary grab bag of a proffer that included such disparate allegations as that defendant "attended many schools" and that "Aunt Jackie shot herself to death."[8] The prosecution objected that defendant was seeking to introduce, through his own testimony, family and personal history that suggested he was mentally ill, and so could not have formed the requisite specific intent to rape Mrs. Miller, without any foundational testimony from a mental health professional as to the relevance of his testimony. The trial court inquired whether defense counsel intended to call "a psychiatrist, psychologist, or whatever to discuss those matters." Defense counsel stated he did not. Based on defense counsel's representation, the trial court excluded defendant's proffered testimony.

There was no error. Defendant testified he heard voices *after* he murdered and raped Mrs. Miller. He did *not* testify that the voices told him to attack her. Therefore, any prior history of hearing voices would not have been relevant to the question whether he specifically intended to rape Mrs. Miller.

Moreover, any error in this regard was harmless. As the Attorney General points out, Dr. Thomas, the court-appointed psychiatrist, interviewed defendant at least three times, and he reviewed reports on defendant's background prepared by defendant's relatives, as well as the reports of numerous experts who had examined defendant. Therefore, if defendant had a history of flashbacks and blackouts, Dr. Thomas should have been aware of it. Accordingly, the fact that Dr. Thomas, when called by the defense in the penalty phase, failed to mention any such history suggests that defendant's proposed testimony concerning such a history would have been a recent fabrication.

---

[8]Defense counsel: "I would just like to generally outline for the record the areas that I would like to get into that at this point at least the court has barred me from getting into.

"The problems at school. [Defendant] was in special education. Attended many schools. . . .

"Drug use; marijuana at 15, alcohol at 15; cocaine about 25 times; some evidence of LSD; family history of mental illness; Aunt Jackie shot herself to death; grandfather had delusions, ran down the street with a gun; and a cousin and a son on ritalin for A.D.D., attention deficit disorder.

"No food; no electricity many times because the family was spending the money on alcohol; both parents were alcoholics; a series of beatings with extension cords; brother who was killed, and the defendant saw the brother in the street; a mother who was promiscuous.

"And I believe the defendant already testified to, when he was about seven or eight, opening the door and seeing her in bed with another man.

"Other incidents of other men, dizzy spells, blackouts, hearing voices, screaming at night—this is all the defendant—and also being told by his mother that . . . his father was not really his father.

"Also the fact that he was afraid to discuss his problems with others because he felt cut off already, and he felt that would make him more cut off.

"And then the incidents which even the D.A. wants to get into, the incidents with both Glynnis and Pam, and particularly Pam's mother; the drug use which all led to the explosion."

### 3. *Alleged Ineffective Assistance of Counsel*

■ Defendant contends his trial counsel was ineffective because he failed to call his court-appointed psychiatrist, Dr. Thomas, in the guilt phase of the trial to testify as to whether defendant had the capacity to form the specific intent to rape Mrs. Miller. "Counsel's failure to put the court-appointed expert on the stand after [defendant] himself had been prohibited from presenting testimony about his past mental condition was incomprehensible and indefensible." The contention lacks merit.

■ " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel (see *People v. Wright* (1990) 52 Cal.3d 367, 412 [276 Cal.Rptr. 731, 802 P.2d 221]), and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437 [48 Cal.Rptr.2d 525, 907 P.2d 373], quoting *Strickland v. Washington* [(1984)] 466 U.S. [668,] 689 [104 S.Ct. 2052, 2065, 80 L.Ed.2d 674].) '[W]e accord great deference to counsel's tactical decisions' (*People v. Frye* (1998) 18 Cal.4th 894, 979 [77 Cal.Rptr.2d 25, 959 P.2d 183]), and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' (*People v. Scott* (1997) 15 Cal.4th 1188, 1212 [65 Cal.Rptr.2d 240, 939 P.2d 354]). 'Tactical errors are generally not deemed reversible, and counsel's decision-making must be evaluated in the context of the available facts.' (*People v. Bolin*[, *supra*,] 18 Cal.4th 297, 333.) [¶] In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. (*People v. Earp*[, *supra*,] 20 Cal.4th [at p.] 896; see also *People v. Fosselman* (1983) 33 Cal.3d 572, 581 [189 Cal.Rptr. 855, 659 P.2d 1144] [on appeal, a conviction will be reversed on the ground of ineffective assistance of counsel 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission'].)" (*People v. Weaver* (2001) 26 Cal.4th 876, 925-926 [111 Cal.Rptr.2d 2, 29 P.3d 103] (*Weaver*).)

■ As the Attorney General points out, the record suggests defense counsel may have had several sound tactical grounds, of which we will mention only two, for not calling Dr. Thomas in the guilt phase of the trial. First, Dr. Thomas's diagnosis of defendant was based on, among other things, information in defendant's probation report that he had raped and threatened to kill Kim. Had the defense called Dr. Thomas in the guilt phase, the prosecution would have been entitled to cross-examine him regarding the foundation for his opinion. (See Evid. Code, § 721, subd. (a); *People v.*

*Coddington* (2000) 23 Cal.4th 529, 614-615 [97 Cal.Rptr.2d 528, 2 P.3d 1081].) Defense counsel may well have concluded, reasonably, that the potential benefit of Dr. Thomas's testifying in the guilt phase, namely, making defendant's self-serving statements regarding his personal and familial history admissible, was outweighed by the damage that would ensue from the revelation of defendant's attack on Kim. Second, defense counsel may have decided against calling Dr. Thomas in the guilt phase because the revelation of statements defendant made to Dr. Thomas would have undermined the credibility of defendant's own guilt phase testimony. For example, defendant initially told Dr. Thomas that he had consensual sex with Mrs. Miller, while he testified at trial that he had no memory of having sex with her.

### 4. *Prior Crimes Evidence*

 Defendant contends the trial court erred by admitting, in the guilt phase of the trial, evidence relating to defendant's prior offenses associated with the rape of Dorothea H. in 1985. Defense counsel twice expressly withdrew his objections to the introduction of the evidence. Therefore, defendant has waived this issue on appeal. (See, e.g., *People v. Robertson* (1989) 48 Cal.3d 18, 44 [255 Cal.Rptr. 631, 767 P.2d 1109] ["Defendant, having withdrawn his objection to the evidence, cannot now complain of its admission"].)

Defendant contends that, because of the waiver, he was deprived of the effective assistance of counsel guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 15 of the California Constitution. This contention also lacks merit. Defense counsel stated on the record that he was, after extensive discussion with defendant, withdrawing his objections for a tactical reason: The other crimes evidence would be admissible in the penalty phase of the trial and, if the jury heard it for the first time then, it might have a "devastating effect on my chances" of convincing the jury to return a verdict of life imprisonment without the possibility of parole. We will not " 'second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight.' (*People v. Scott*[, *supra*,] 15 Cal.4th [at p.] 1212)." (*Weaver, supra,* 26 Cal.4th at p. 926.)

Citing *People v. Frank* (1985) 38 Cal.3d 711 [214 Cal.Rptr. 801, 700 P.2d 415], defendant argues that, because this is a capital case, we should disregard counsel's waiver of this issue and, instead, examine the whole record to determine whether there has been a miscarriage of justice. (See *id.* at p. 729, fn. 3 ["On an appeal from a judgment imposing the penalty of death, a technical insufficiency in the form of an objection will be disregarded and the entire record will be examined to determine if a miscarriage

of justice resulted"].) The argument is meritless. "We previously have noted that '[t]he lead opinion in *Frank* was not signed by a majority of the court, and although later cases from this court have never disapproved its language, they have cited it only for the purpose of distinguishing it.' (*People* v. *Diaz* (1992) 3 Cal.4th 495, 527 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)" (*People v. Williams* (1997) 16 Cal.4th 153, 209 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Moreover, defendant's reliance on the *Frank* footnote is misplaced, as his waiver consisted not merely in raising technically insufficient objections, but in expressly withdrawing his objections. (See *Williams*, at p. 209; *People v. Poggi* (1988) 45 Cal.3d 306, 331 [246 Cal.Rptr. 886, 753 P.2d 1082].)

Defendant contends his counsel was "prompted" to withdraw his objection to the other crimes evidence because the trial court improperly deferred ruling on the admissibility of the evidence under Evidence Code section 352. The trial court did not err in deferring its ruling under Evidence Code section 352 until the prosecution had presented the rest of its evidence. (See *People v. Williams* (1988) 44 Cal.3d 883, 912-913 [245 Cal.Rptr. 336, 751 P.2d 395].) Moreover, the fact that the court deferred its ruling was really irrelevant to the concern expressed by defense counsel in withdrawing his objection to the admissibility of the evidence, namely, that it might have more impact on the jury if it were heard by them for the first time in the penalty phase.

### 5. *Instructions Regarding the Specific Intent for Rape Felony Murder*

Defendant contends the instructions given with regard to rape and rape felony murder were "conflicting, inaccurate, and confusing," with the result that defendant was deprived of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, as well as the corresponding provisions of the California Constitution.

The jury found defendant guilty of first degree murder and found true the special circumstance that the murder was committed during the commission of a rape. The jury's first degree murder finding could have been based on one or both of the following theories: (1) that the murder was willful, deliberate and premeditated; or (2) that it was committed during the perpetration of, or attempt to perpetrate, rape, i.e., that it was rape felony murder. (See § 189.)

Under the felony-murder doctrine, the perpetrator must have the specific intent to commit the underlying felony. (*Berryman, supra,* 6 Cal.4th at p. 1085.) Thus, although rape itself is a general intent crime, the jury here was required to find that defendant had the specific intent to rape in order to

find him guilty of first degree felony murder. (*People v. Osband* (1996) 13 Cal.4th 622, 685-686 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

The jury was so instructed. In accordance with CALJIC No. 8.21, the court instructed the jury: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission or attempted commission of a crime as a direct causal result of Burglary, Rape and/or Robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime. [¶] The specific intent to commit Burglary, *Rape* and/or Robbery and the commission or attempted commission of such crime must be proved beyond a reasonable doubt." (Italics added.)

The lesson of the instruction that is pertinent to this discussion—that rape felony murder requires a specific intent to rape—was reinforced by a modified version of CALJIC No. 4.21.1 on the significance of voluntary intoxication for general and specific intent crimes. The instruction given provided in pertinent part: "In order to find the defendant guilty of First Degree Murder on a Felony-Murder theory, of which the defendant is accused in Count[] 1, a necessary element is the existence in the mind of the defendant of the specific intent to commit the crime of Burglary, *Rape* and/or Robbery." (Italics added.)

Defendant contends that the jury was likely confused by having been instructed that while rape is a general intent offense, rape felony murder requires a specific intent to rape. We rejected much the same contention in *People v. Ramirez* (1990) 50 Cal.3d 1158 [270 Cal.Rptr. 286, 791 P.2d 965]. "In accord with the general CALJIC instructions, the trial court instructed the jury that rape and sodomy are general intent crimes, but that rape-felony-murder requires a finding that defendant had the specific intent to commit rape. Although defendant does not contend that the instructions erroneously stated the applicable legal principles, he maintains that the combination of general and specific intent elements could only have been confusing to the jury, requiring 'proof of contradictory mental states.' The Attorney General responds that the instructions were not misleading and did not require proof of contradictory mental states, but rather accurately set forth the different elements of the separate crimes with which defendant was charged. [¶] The Attorney General's position is well taken. The instructions did not require proof of contradictory mental states. Under the instructions, if the jury found that defendant did not act with the specific intent to rape, it could have found him guilty of rape but not of rape-felony-murder. If the jury found that defendant did act with the specific intent to rape, it could have found him guilty of both rape and rape-felony-murder. There was no inconsistency in the instructions." (*Id.* at pp. 1177-1178, fn. omitted.)

Moreover, both the prosecutor and defense counsel in their arguments to the jury emphasized repeatedly that rape felony murder requires a specific intent to rape, and a question asked by the jury revealed that the jurors understood this point perfectly well.

Defendant next contends that the modified version of CALJIC No. 4.21.1 given here told the jury, in effect, that voluntary intoxication or mental disorder could not be considered in determining whether defendant had the specific intent to commit rape. However, the language with which defendant specifically finds fault was not included in the instruction given. Instead, the jury was instructed that rape felony murder requires the specific intent to rape, and that where specific intent is an essential element of a crime, the defendant's voluntary intoxication or mental disorder should be considered in determining whether he possessed the requisite specific intent.

Again, in his arguments to the jury, the prosecutor emphasized that voluntary intoxication and mental disease could negate the specific intent required for rape felony murder. "You got instructions on voluntary intoxication and the effect that could have on lessening a mental state, on lessening a specific intent. [¶] If you are so high you don't know what you're doing or you couldn't form an intent to kill or an intent—specific intent to burglarize or specific intent to rape for the purposes of felony rape murder, that can make—that can knock out that specific intent." "Let's make it real clear. He raped her and he killed her. We know he raped her. Did he have the specific intent to rape her. If yes, it's felony murder, first degree, just on that basis, and the special circumstance of rape is true. [¶] The only way to get rid of that specific intent is . . . with the . . . mental defect or disorder or the voluntary intoxication. Neither flies."

Moreover, defendant waived any objection to the modified version of CALJIC No. 4.21.1 given here by expressly agreeing to the modifications.[9] (See *Rodrigues*, *supra*, 8 Cal.4th at p. 1192 ["[I]f defendant believed the instruction was unclear, he had the obligation to request clarifying language"].)

Finally, defendant contends the trial court should have instructed the jury that the specific intent to rape must be formed before or during the act of violence. The claim lacks merit. "[A]n after-formed intent instruction is a

---

[9]As the Attorney General points out, during discussion of the proposed instructions, defense counsel expressed his concern that the standard version of CALJIC No 4.21.1 failed to make it clear that voluntary intoxication could negate the specific intent required for rape felony murder. After considering a modification suggested by defense counsel, the court suggested the modification actually given. Defense counsel stated that he "would be happy to use the court's" instruction and that the instruction was "agreeable."

pinpoint instruction that a trial court has no obligation to give when neither party has requested that it be given. (*People v. Webster*[, *supra*,] 54 Cal.3d 411, 443.)" (*People v. Silva, supra*, 25 Cal.4th 345, 371.) Moreover, the trial court here gave the standard jury instruction on felony murder and burglary, rape, and robbery, which stated that a killing "which occurs during the commission or attempted commission of a crime as a direct causal result of Burglary, Rape and/or Robbery is murder of the first degree when the perpetrator had the specific intent to commit such crime." A reasonable juror would necessarily have understood from this instruction that defendant was guilty of rape felony murder only if the intent to rape was formed before the murder occurred. (*Silva*, at p. 372; *People v. Hayes* (1990) 52 Cal.3d 577, 629 [276 Cal.Rptr. 874, 802 P.2d 376].)

### 6. *Verdict Form for Rape-felony-murder Special Circumstance*

The jury found true the allegation that "[t]he crime of murder of the first degree of which you have found the defendant guilty was a murder committed in the commission of rape." Defendant contends the verdict form was fatally ambiguous because it is unclear whether the jury was finding defendant guilty of first degree murder on a rape-felony-murder theory (§ 189), or whether it was finding true the rape-felony-murder special circumstance (§ 190.2, subd. (a)(17)(C)).

As the Attorney General points out, defendant waived this issue by failing to object to the form of the verdict when the court proposed to submit it or when the jury returned its finding. (*People v. Bolin, supra*, 18 Cal.4th at p. 330.)

In any event, " '[t]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]' " (*People v. Bolin, supra*, 18 Cal.4th at p. 331.) Here, the jury's intent—to find true the rape-felony-murder special circumstance—is unmistakably clear because the jury was instructed: "If you find the defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or not true: Murder during the commission of a Burglary, Rape and/or Robbery. . . . *You will state your special finding as to whether this special circumstance is or is not true on the form that will be supplied.*" In his closing argument the prosecutor reiterated that the jury was to indicate on the verdict form whether it found the special circumstances allegations true or not true. Finally, in its verdict in the penalty phase of the trial, the jury stated that it had "found the special circumstance true."

Moreover, any error in this regard was harmless beyond a reasonable doubt. The jury found in its verdict that defendant committed the murder in the commission of rape. To find the rape-felony-murder special-circumstance allegation true, they needed to find that defendant had an independent purpose for the commission of the rape, that is, that the commission of the rape was not merely incidental to the murder. (*People v. Mendoza* (2000) 24 Cal.4th 130, 182 [99 Cal.Rptr.2d 485, 6 P.3d 150].) The evidence is overwhelming that defendant had an independent purpose to rape Mrs. Miller. He tied her hands and feet, had intercourse with her, and ejaculated inside her. He had previously done the same thing to Mrs. H., whom he did not kill. Clearly, defendant obtained perverse sexual gratification from raping the mothers of his girlfriends, whether or not he killed them. There can be no reasonable doubt that the rape of Mrs. Miller was not merely incidental to her murder. (See *People v. Williams, supra*, 44 Cal.3d at p. 929 ["[T]he omission of an instruction that an independent felonious purpose is an element of the kidnapping special circumstance was harmless beyond a reasonable doubt since no rational jury could have failed to find that a purpose other than and in addition to killing [the victim] precipitated the kidnapping"].)

### C. *Penalty Phase Issues*

#### 1. *Future Dangerousness*

 James Park, a defense expert witness, testified that, based on his review of defendant's prison records, defendant was not in his opinion likely to be violent if again sentenced to prison. On direct examination, defense counsel elicited the fact that defendant had been involved in one fight while previously imprisoned. However, defendant contends the trial court prejudicially erred in overruling his objection to the prosecution's cross-examination of the expert. The cross-examination concerned three other disciplinary infractions defendant committed while in prison, which are characterized by defendant as a "yelling match in a food line with another inmate that never escalated into a fight" and two attempts by defendant "to manufacture a crude form of alcohol in his cell."

"While the prosecution is prohibited from offering expert testimony predicting future dangerousness in its case-in-chief ([*People v.*] *Adcox* [(1988)] 47 Cal.3d [207,] 257 [253 Cal.Rptr. 55, 763 P.2d 906]), it may explore the issue on cross-examination or in rebuttal if defendant offers expert testimony predicting good prison behavior in the future. (*People v. Gates* [(1987)] 43 Cal.3d [1168,] 1211 [240 Cal.Rptr. 666, 743 P.2d 301]; *People v. Coleman* (1989) 48 Cal.3d 112, 150 [255 Cal.Rptr. 813, 768 P.2d 32].) As we said in

*Gates*: 'If the defense chooses to raise the subject, it cannot expect immunity from cross-examination on it.' ([*Gates, supra,*] 43 Cal.3d at p. 1211.)" (*People v. Morris* (1991) 53 Cal.3d 152, 219 [279 Cal.Rptr. 720, 807 P.2d 949], overruled on another point by *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588]; see *People v. Seaton* (2001) 26 Cal.4th 598, 679 [110 Cal.Rptr.2d 441, 28 P.3d 175].)

Defendant is wrong when he says the three incidents were irrelevant to the question whether he was likely to be violent if he were again sentenced to prison. At first, the expert minimized the incident in the food line, characterizing it as "childish." "[Defendant] wanted another man's crackers and somehow they wouldn't give it to him, and he ended up yelling a lot. [¶] And again, he was kind of young and nothing developed other than there was kind of a shouting match." However, he later admitted that when defendant started yelling, other inmates joined in, and a guard had to intervene because of the danger that the incident would escalate into violence. Defendant's attempts to make alcohol in his cell were also clearly relevant because defendant's murder of Julia Miller was preceded by alcohol, as well as drug, abuse, and there was expert testimony that defendant had a mental illness in which drug and alcohol abuse was a "major exacerbating factor, meaning those things made the mental illness worse."

Defendant contends that the court compounded its asserted error in permitting this line of cross-examination by precluding the defense expert from testifying that, if defendant were sentenced to imprisonment without possibility of parole, he would be confined in such a secure setting that he would be unlikely to engage in violence. The contention lacks merit. "[E]vidence of the conditions of confinement that a defendant will experience if sentenced to life imprisonment without parole is irrelevant to the jury's penalty determination because it does not relate to the defendant's character, culpability, or the circumstances of the offense. (*People v. Daniels* (1991) 52 Cal.3d 815, 876-878 [277 Cal.Rptr. 122, 802 P.2d 906]; *People v. Thompson* (1988) 45 Cal.3d 86, 138-139 [246 Cal.Rptr. 245, 753 P.2d 37].) Its admission is not required either by the federal Constitution or by Penal Code section 190.3. (*People v. Daniels, supra,* 52 Cal.3d at pp. 876-878; *People v. Thompson, supra,* 45 Cal.3d at pp. 138-139.)" (*People v. Quartermain* (1997) 16 Cal.4th 600, 632 [66 Cal.Rptr.2d 609, 941 P.2d 788].) "Moreover, '[d]escribing future conditions of confinement for a person serving life without possibility of parole involves speculation as to what future officials in another branch of government will or will not do. [Citation.]' (*People v. Thompson, supra,* 45 Cal.3d at p. 139.) Although defendant argues that 'this logic is incorrect and the matter should be revisited, at least as to the question of the admissibility of evidence about

how a life without parole prisoner would live,' he advances no persuasive reason as to why this is so." (*People v. Majors* (1998) 18 Cal.4th 385, 416 [75 Cal.Rptr.2d 684, 956 P.2d 1137].) We have been given no reason to reconsider our holdings in this regard. (See *People v. Ervin* (2000) 22 Cal.4th 48, 97 [91 Cal.Rptr.2d 623, 990 P.2d 506].)

### 2. *Alleged Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct insofar as he implied that defendant was a member of a prison gang.

The alleged misconduct occurred during the prosecutor's cross-examination of the defense expert witness, Mr. Park. On direct examination, Mr. Park testified that defendant's records indicated that he had been disciplined for a fight while he was previously imprisoned, and that the person with whom defendant had fought was a gang member. "[Defendant] got into a fight with a prison gang member who—somebody who was identified by the staff as a gang member, and [defendant] was disciplined, not severely, but disciplined for that." On cross-examination, the prosecutor, after he had Mr. Park refresh his recollection by reviewing the disciplinary report on the fight, asked Mr. Park: "Now, actually what it says here is that Mr. Jones admits the charges and that he stated that he started the fight over Crip business. [¶] Isn't that what it says here?" Mr. Park responded, "That was his statement, yes, sir." The prosecutor pursued the point. "Okay. So doesn't that—I mean you said he got in a fight with another gang member. [¶] Wouldn't that indicate that he actually was fighting over gang business that he was involved in?" Mr. Park demurred. "Not necessarily. Because Mr. Jones would have to guard his reputation. He could have been fighting with this alleged Crip for a lot of reasons and he is not going to say." Later, the prosecutor asked, "And isn't it true in your experience that gang members actually get involved in a greater number of violent altercations than other inmates in the facility?" Again, Mr. Park demurred. "I couldn't say that independently now."

██ It is, of course, the general rule that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. (*People v. Ayala* (2000) 23 Cal.4th 225, 284 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *Berryman, supra,* 6 Cal.4th at p. 1072; *People v. Ashmus* (1991) 54 Cal.3d 932, 976 [2 Cal.Rptr.2d 112, 820 P.2d 214] (*Ashmus*).) Defendant concedes that defense counsel did not make a timely objection to the questions of which he now complains. However, defendant notes that defense counsel

later requested that "all the testimony be stricken from the cross-examination about *that*," and defendant argues that *that* referred to the prosecutor's cross-examination of Mr. Park with regard to defendant's fight with the prison gang member. To the contrary, viewed in context, defense counsel's motion to strike was directed at questions asked by the prosecutor suggesting that a person imprisoned for crimes of violence is more likely than a person imprisoned for nonviolent offenses to commit acts of violence while in prison. It is true that the rule in question does not apply when the harm could not have been cured. (*Ashmus*, at p. 976; see *Memro*, *supra*, 11 Cal.4th at pp. 873-874.) Such a situation, however, was not present here; any harm threatened was certainly curable.

Defendant contends that defense counsel was ineffective in failing to preserve this issue for appeal. As the record on appeal does not reveal why defense counsel chose not to object to this line of questioning, this ineffective assistance of counsel claim would be more appropriately raised in a habeas corpus petition. (*People v. Hart* (1999) 20 Cal.4th 546, 619, fn. 21 [85 Cal.Rptr.2d 132, 976 P.2d 683].)

Defendant further contends that, in referring to defendant as having fought with "another gang member," the prosecutor *falsely* implied that the disciplinary report on this incident indicated that defendant, as well as the prisoner with whom he fought, was a member of a prison gang. "[T]he inference raised by the line of questioning was unwarranted—there was no evidence of gang membership other than the insinuations of the prosecutor." Again, this is a matter better raised on habeas corpus because the disciplinary report in question was not entered into evidence in this trial.

### 3. *Privilege Against Self-incrimination*

Defendant contends that the trial court, by ordering the defense to provide the prosecution with unredacted copies of the reports prepared by the court-appointed psychiatrist, Dr. Thomas, before the doctor testified for the defense in the penalty phase of the trial, violated defendant's privilege against self-incrimination under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, as well as the work-product and attorney-client privileges.

Prior to the penalty phase of the trial, defense counsel gave the prosecutor copies of reports that had been prepared by Dr. Thomas. The defense had redacted from Dr. Thomas's reports statements that defendant had made to the doctor, as well as conclusions that the doctor had drawn from defendant's statements to him. The prosecution moved that the defense be ordered

to provide the prosecution with unredacted copies of Dr. Thomas's reports so that he might be effectively cross-examined. The defense opposed the motion on the ground that such an order would violate defendant's privilege against self-incrimination, his right to counsel, and the work-product and attorney-client privileges. Before ruling, the court inquired whether the defense "definitely" intended to call Dr. Thomas as a witness in the penalty phase, and the defense responded that it did. The court then ordered the defense to turn over the unredacted reports, explaining that providing them to the prosecution prior to Dr. Thomas's testimony would obviate the necessity of granting the prosecution a continuance to review the unredacted reports after Dr. Thomas testified. Dr. Thomas subsequently testified as a defense witness.

There was no error. By injecting his mental state as an issue in the case, and calling Dr. Thomas to testify, defendant waived any challenge to the contents of the interviews on which Dr. Thomas relied. (See *People v. Coleman, supra,* 48 Cal.3d at pp. 151-152.)[10] Moreover, any error in this regard was clearly harmless under either the reasonable possibility standard or the beyond a reasonable doubt standard.[11] Challenged by the Attorney General to identify any harm resulting from the prosecution's having received Dr. Thomas's unredacted reports, defendant asserts that he was prejudiced by the revelation in Dr. Thomas's

---

[10]Defendant's reliance on *Andrade v. Superior Court* (1996) 46 Cal.App.4th 1609 [54 Cal.Rptr.2d 504] (*Andrade*) and *Rodriguez v. Superior Court* (1993) 14 Cal.App.4th 1260 [18 Cal.Rptr.2d 120] (*Rodriguez*) is misplaced. *Andrade* and *Rodriguez* dealt with *pretrial* discovery orders, whereas the order here was made in the midst of the penalty phase of the trial. In *Rodriguez*, the trial court ordered the defendant to provide the prosecutor with pretrial discovery, pursuant to Penal Code section 1054 et seq., of all guilt phase material. In response, the defendant supplied the prosecutor with the report of a psychologist he intended to call. However, the defendant deleted from the report remarks that he had made to the psychologist regarding the charged offenses. When the prosecutor moved to compel production of the unredacted report, the trial court ruled that the full report should be disclosed if the defendant intended to call the psychologist as a witness. The Court of Appeal issued a writ of mandate directing the superior court to vacate its order. It held that the defendant's statement to the psychologist was a privileged communication under the attorney-client privilege and that such privileged information "is not subject to disclosure at the time the witness is designated pursuant to section 1054.3." (*Rodriguez,* at p. 1269.) *Andrade,* another pretrial discovery case, followed *Rodriguez,* finding its reasoning persuasive. (*Andrade,* at p. 1614.) As the order in this case, unlike the orders in *Andrade* and *Rodriguez,* was not made prior to defendant's trial, the pretrial discovery rules set out in section 1054.3 are not implicated.

[11]State law error occurring during the penalty phase will be considered prejudicial when there is a *reasonable possibility* such an error affected a verdict. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1232 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Brown* (1988) 46 Cal.3d 432, 447 [250 Cal.Rptr. 604, 758 P.2d 1135].) Our state *reasonable possibility* standard is the same, in substance and effect, as the *harmless beyond a reasonable doubt* standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]. (*People v. Ochoa* (1998) 19 Cal.4th 353, 479 [79 Cal.Rptr.2d 408, 966 P.2d 442]; *Ashmus, supra,* 54 Cal.3d at p. 965.)

reports that defendant initially told Dr. Thomas that the victim, Julia Miller, consented to have sex with him. This revelation, defendant contends, "cut deep into the heart of his defense, specifically that he blacked out and did not recall the events prior to and during the murder." However, the significance of defendant's claim that he blacked out prior to killing and raping Mrs. Miller was the implication that he was therefore incapable of the deliberation required for first degree murder. The jury, by returning its verdict of first degree murder, had already clearly rejected that claim before Dr. Thomas testified in the penalty phase. Moreover, Dr. Thomas testified that he considered defendant's statement that Mrs. Miller consented to have sex with him a "delusional belief."

### 4. *Lack of Remorse*

During the penalty phase of the trial, in its case-in-chief, the prosecution called Gloria Hanks, defendant's sister, who testified that after the murder defendant told her he "didn't give a fuck about [the victim's daughter] Pam or her family." Defendant contends this evidence of his lack of remorse was improperly used by the prosecution as an aggravating factor.

A prosecutor may not present evidence in aggravation that is not relevant to the statutory factors enumerated in section 190.3. (*People v. Crittenden* (1994) 9 Cal.4th 83, 148 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782].) "A murderer's attitude toward his actions and the victims at the time of the offense is a 'circumstance[] of the crime' (§ 190.3, factor (a)) that may be either aggravating or mitigating. [Citations.]" (*People v. Cain* (1995) 10 Cal.4th 1, 77 [40 Cal.Rptr.2d 481, 892 P.2d 1224], fn. omitted.) However, a lack of remorse expressed afterwards, as is the case here, is not an aggravating factor under the statute. (*Crittenden*, at p. 150, fn. 17.) On the other hand, "the absence of remorse is relevant to the determination whether the mitigating factor of remorse is present; thus, the prosecutor properly may suggest that an absence of evidence of remorse weighs against a finding of remorse as a mitigating factor. [Citations.]" (*Id.* at p. 148, italics omitted.)

As defendant points out, when counsel were arguing to the court the admissibility of Ms. Hanks's testimony, one of the remarks made by the prosecutor suggests that he considered defendant's lack of remorse an aggravating factor. "*Clearly it increases the heinousness of the crime* and it refutes what he does at the guilt phase which is to mitigate it, and I think it's clearly relevant for that." However, the second half of the prosecutor's statement reveals that he was really offering Ms. Hanks's testimony to rebut evidence of remorse that defendant had introduced in the guilt phase. Indeed, the prosecutor informed the court that he had originally intended to reserve Ms. Hanks as a rebuttal witness in the penalty phase in the event that

defendant put on evidence of remorse in that phase, but then decided it would be more appropriate to call her in his case-in-chief in the penalty phase because defendant had already presented evidence of remorse in the guilt phase.[12]

The defense evidence in the guilt phase of the trial as to defendant's conduct following the murder may, as defendant now argues, have been "offered as evidence of defendant's mental state at the time of [the] killings," i.e., that he "lacked the specific intent to rape," and not as evidence of remorse. However, defendant's testimony that he shot himself in an attempt to commit suicide was also susceptible of interpretation by the jury as an expression of remorse when, as defense counsel put it in his argument to the jury at the conclusion of the guilt phase of the trial, defendant "realized the terrible thing that he had done." Therefore, Ms. Hanks's testimony was properly admitted to assist the jury in determining whether defendant truly felt remorseful for his crimes. In argument to the jury at the conclusion of the penalty phase of the trial, the prosecutor cast Ms. Hanks's testimony in this light, and not as evidence in aggravation.

Defendant contends the prosecution failed to give him the notice of Ms. Hanks's testimony required by section 190.3. Section 190.3 provides in pertinent part: "Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation." Here, defendant did not make his statement to Ms. Hanks until the trial started, and, as defense counsel acknowledged and the trial court found, the prosecution disclosed the statement to the defense as soon as the prosecution learned of it. Therefore, defendant received timely notice. Moreover, Ms. Hanks's testimony was introduced in rebuttal to mitigation evidence introduced by the defendant in the guilt phase. Therefore, notice was not required by section 190.3 in any event.

Finally, defendant contends Ms. Hanks's testimony should have been excluded on the ground that it was "confusing, misleading, and highly

---

[12]"As I thought about that [—reserving Ms. Hanks as rebuttal witness in the penalty phase—] over the weekend, I thought . . . actually I don't know if Mr. Jones is going to get on the stand and express remorse. I don't know if [Ms. Hanks's testimony] would be relevant as a rebuttal witness [to testimony given in the penalty phase], and clearly in the guilt phase, I think there is a sense of remorse that the defendant put on.

"He woke up next to the victim. He testified he was crying. All he wanted to do was kill himself, and I think he has wanted to have all his actions after this incident taken as remorse for the victim.

"I think that what [Ms. Hanks's testimony] does is show clearly that the defendant doesn't feel remorse towards the victim or the family."

prejudicial while bereft of probative value." Defendant claims Ms. Hank's testimony was unreliable because she "was 'a bottle and a half' into her New Year's celebration" when she had the telephone conversation with defendant. Ms. Hanks admitted she could not remember the entirety of the conversation, "just bits and pieces of it," because she had been drinking. However, the fact that Ms. Hanks had been drinking when the conversation occurred goes to the weight of the evidence, not its admissibility. Pursuant to Evidence Code section 352, the trial court ruled the probative value of Ms. Hanks's testimony was not outweighed by its prejudicial effect. We find no error.

### 5. *Constitutionality of the Death Penalty*

 Defendant contends the statutory scheme governing the death penalty in California is unconstitutional on several grounds. We have repeatedly rejected similar contentions and do so again here. Specifically, the death penalty law is constitutional though it (1) does not require the jury to make specific *written* findings as to aggravating factors (see, e.g., *People v. Lewis* (2001) 25 Cal.4th 610, 677 [106 Cal.Rptr.2d 629, 22 P.3d 392] ["Written findings by the penalty phase trier of fact are not constitutionally required"]); (2) does not require that the jury return *unanimous* written findings as to the aggravating factors (see, e.g., *People v. Seaton, supra,* 26 Cal.4th at p. 688; *People v. Taylor* (1990) 52 Cal.3d 719, 749 [276 Cal.Rptr. 391, 801 P.2d 1142] ["We have consistently held that unanimity with respect to aggravating factors is not required by statute or as a constitutional procedural safeguard"]); (3) does not require that the jury be instructed on *the presumption of life* (see, e.g., *People v. Arias* (1996) 13 Cal.4th 92, 190 [51 Cal.Rptr.2d 770, 913 P.2d 980] [rejecting the contention that the death penalty statute is "constitutionally deficient because it 'fails to require a presumption that life without parole is the appropriate sentence' "]); (4) does not provide for intercase proportionality review (see, e.g., *People v. Anderson* (2001) 25 Cal.4th 543, 602 [106 Cal.Rptr.2d 575, 22 P.3d 347] [rejecting the contention that intercase proportionality review is required "as a matter of due process, equal protection, fair trial, or cruel and/or unusual punishment concerns"]).

Defendant's argument that "one under judgment of death suffers cruel and unusual punishment by the inherent delays in resolving his appeal is untenable. If the appeal results in reversal of the death judgment, he has suffered no conceivable prejudice, while if the judgment is affirmed, the delay has prolonged his life. [Citation.]" (*People v. Anderson, supra,* 25 Cal.4th at p. 606.) Finally, death by lethal injection does not constitute cruel or unusual punishment. (See, e.g., *People v. Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

### 6. *International Law*

Defendant contends "[t]he due process violations and racial discrimination that [he] suffered throughout his trial and sentencing phase are prohibited by

customary international law." Because defendant has entirely failed to establish the predicates of his argument—that he suffered prejudicial violations of due process or racial discrimination during his trial—we have no occasion to consider whether such violations would also violate international law. (*People v. Bolden* (2002) 29 Cal.4th 515, 567 [127 Cal.Rptr.2d 802, 58 P.3d 931].)

### 7. *Cumulative Prejudice in Guilt and Penalty Phases*

Defendant contends the cumulative effect of asserted errors denied him his federal constitutional rights to a fair trial and a reliable penalty determination, thus requiring reversal of both the guilt and penalty judgments. Our careful review of the record convinces us the trial was fundamentally fair and the penalty determination reliable. No basis for reversal appears.

## III. DISPOSITION

The judgment is affirmed in its entirety.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

**KENNARD, J.**—I concur generally with the majority opinion. I disagree, however, with its analysis of one issue, which I discuss below.

Defendant was charged with the first degree murder and rape of Julia Miller, and there was a special circumstance allegation that the murder occurred during a rape. In defendant's testimony at the guilt phase of his capital trial, he did not deny killing Miller and having sexual intercourse with her before she died. He testified, however, while struggling with Miller, he "kind of slipped back into [his] childhood." He had no recollection of having intercourse with Miller, but he remembered picking up a knife and stabbing her, and then "being curled up in a ball crying." When he looked at Miller, he realized she was dead. While driving away from Miller's house, he began "hearing certain little things in my head," which he described as "paranoia, thinking someone was coming to kill me." Based on this testimony, the defense argued that defendant lacked the specific intent to rape, a necessary element when, as here, the prosecution alleges under the felony-murder rule that an unlawful killing is first degree murder because it took place during a rape.

To support his claim that he lacked this intent, defendant sought to testify that he had a long history of untreated psychiatric problems. At a hearing to consider the admissibility of this testimony, defense counsel stressed that defendant had heard voices, that as a child he was placed in special education classes, that other members of his family were mentally ill, that he had abused drugs, and that he was an abused child who grew up in poverty.

Counsel also mentioned defendant's "dizzy spells, blackouts, [and] screaming at night . . . ." The trial court excluded the testimony on the ground that it was not supported by expert psychiatric testimony.

Defendant now claims the trial court prevented him from testifying that "he had an extensive history of hearing voices, flashbacks, and blackouts." The majority holds that the trial court properly excluded defendant's testimony, but it relies on a different ground than the trial court. The majority points out that defendant testified he heard voices only *after* he had intercourse with and killed Miller, so his previous history of hearing voices was irrelevant to his intent to rape her. (Maj. opn., *ante*, at p. 1253.) True. But defendant testified that he blacked out and had a flashback to his childhood *before* he had sex with Miller, so the majority's reasoning does not address his claim that the court erroneously excluded testimony about his alleged history of blackouts and flashbacks. I would reject this claim because defense counsel's passing reference to blackouts, without any information as to when and how often they had occurred, was insufficient to show that the blackouts were probative on the question of whether defendant intended to rape Miller. Also, the trial court did not prevent defendant from testifying about flashbacks because defense counsel did not mention flashbacks in his offer of proof.

The majority also finds any error harmless. It reasons that at the penalty phase, a defense psychiatrist who had interviewed defendant did not mention defendant's history of blackouts or flashbacks. This, according to the majority, implies that defendant's proposed testimony was a recent fabrication. In my view, the expert's testimony has no bearing on whether the trial court's exclusion of defendant's testimony was harmless, because the expert testified at the *penalty phase*, whereas defendant's testimony was offered at the *guilt phase*. Nevertheless, I agree with the majority that any error was harmless: defendant's offer of proof included nothing that could have altered the jury's determination that he intended to rape Miller when he had sexual intercourse with her before killing her.

On April 30, 2003, the opinion was modified to read as printed above.