Filed 5/30/13  P. v. Thornton CA5

<u>**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | F064859 |
| v. | (Super. Ct. No. F09904930) |
| OLICE DAVID THORNTON, JR., | **O P I N I O N** |
| Defendant and Appellant. | |

<u>**THE COURT**</u>\*

APPEAL from a judgment of the Superior Court of Fresno County.  Mark Wood Snauffer, Judge.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Wanda Hill Rouzan, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Wiseman, Acting P.J., Cornell, J., and Franson, J.

On July 19, 2010, a jury convicted appellant, Olice David Thornton, Jr., of two counts of assault with a deadly weapon (Pen. Code,[1] § 245, subd. (a)(1)) and found true allegations that in committing one of those offenses, he personally inflicted great bodily injury (§ 12022.7, subd. (a)), and that he personally used a dangerous and deadly weapon in committing each of them. In a court trial the next day, the court found true allegations that appellant had suffered two "strikes"[2] and two prior serious felony convictions within the meaning of section 667, subdivision (a)(1), and that he had served three separate prison terms for prior felony convictions (§ 667.5, subd. (b)). On September 8, 2010, the court struck one of appellant's strikes and imposed a prison term of 22 years.

Appellant appealed, and on appeal his sole contention was that the court erred in failing to conduct a *Marsden* hearing.[3] This court, on October 24, 2011, reversed, holding that the court erred in failing to conduct a *Marsden* hearing, and remanded the matter to the trial court, ordering, inter alia, that the court conduct such a hearing.

On remand, on April 27, 2012, the trial court conducted a *Marsden* hearing, at which it denied appellant's *Marsden* motion and reinstated the judgment. The instant appeal followed.

---

[1]     All statutory references are to the Penal Code.

[2]     We use the term "strike," in its noun form, as a synonym for "prior felony conviction" within the meaning of the "three strikes" law (§§ 667, subds. (b)-(i), 1170.12), i.e., a prior felony conviction or juvenile adjudication that subjects a defendant to the increased punishment specified in the three strikes law.

[3]     In *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*), the California Supreme Court held that when a criminal defendant requests a new appointed attorney, a trial court must conduct a proceeding in which it gives the defendant an opportunity to explain the basis for the contention that counsel is not providing adequate representation. (*Id*. at pp. 123-125.) A motion for the appointment of substitute counsel on the ground that the current appointed counsel is providing inadequate representation, and the hearing on that motion, are commonly called, respectively, a *Marsden* motion and a *Marsden* hearing.

On appeal, appellant's sole contention is that the court erred in denying his *Marsden* motion. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Facts*

Keith Thompson testified to the following: He was living at the Fresno Inn (the motel) when, one day in July 2009, at approximately 10:30 or 11:00 a.m., Zachariah Boyd came to Thompson's room, at which time Thompson gave Boyd some marijuana. Boyd then left and Thompson, who was "working in the office," went to the motel office. When he returned to his room approximately ten minutes later, he found that the door to his room had been kicked in and that his marijuana was missing. Boyd was the only other person who knew where in the room Thompson kept his marijuana. Later, while Thompson was fixing his door, appellant came by. He wanted to buy some marijuana. Thompson explained that Boyd had kicked his door in and stole his (Thompson's) marijuana.

Zachariah Boyd testified to the following: He was living at the motel when, on July 17, 2009, at approximately 4:45 p.m., appellant knocked on his door. Boyd came to the door and appellant asked him to "step outside ...." Boyd did so, and appellant immediately began yelling, accusing him of stealing marijuana "from somebody's motel room," and demanding that Boyd turn the marijuana over to him or "pay him ... an amount of money." Appellant was "obviously pretty upset," so Boyd, who had not stolen the marijuana, "tried to agree with him, and ... not do anything to upset him more." As the two talked, Boyd noticed that appellant was holding in his right hand an axe handle, approximately three feet in length. Subsequently, appellant told Boyd, "'You owe me like a hundred dollars,'" and "at that point" appellant swung the axe handle at Boyd and struck him in the left shoulder, "and [the axe handle] bounced off and hit [Boyd] in the cheek." After appellant hit him, Boyd "raised [his] hands up" and said he would do

3

whatever appellant wanted and "try to make it right." Appellant walked away and Boyd went to his room and put an ice pack on his shoulder. Boyd suffered a "[b]it of bruising, bit of swollen ness [*sic*], but other than that, no [other injuries]."

James Salyer testified to the following: On July 17, 2009, at approximately 5:00 p.m., he was in his room at the motel when somebody came to his door and told him appellant, who was a friend of Salyer's, was "hitting people with an ax[e] handle." Salyer went outside "to try to calm [appellant] down." Salyer approached appellant, who was "by the stairs on the west side of the motel premises." Appellant was "headed towards the stairs to chase down" Boyd and another motel resident, who were trying to get away from him. Appellant was "pretty enraged," and he was holding in his right hand an approximately three-foot-long axe handle.

Salyer further testified to the following: As he approached appellant, appellant told him, "'Mind your own fucking business.'" Salyer admonished him to "just calm down" and "think about what [he was] doing," at which point appellant first punched Salyer in the face and then swung the axe handle and "hit [Salyer] across [his] back, [his] shoulder blade and back area." Next, appellant again swung the axe handle, this time at Salyer's head. Salyer blocked it with his left hand, "and it crushed two bones in [his] hand ...." Salyer "then ... got up off the ground, and [appellant] swung [the axe handle] a third time, and it split open the back of [Salyer's] head."

City of Fresno Police Officer Carlos Frausto testified to the following: At approximately 5:00 p.m. on July 17, 2009, responding to a report of a "disturbance ... involving three subjects" at the motel, he drove into the motel parking lot and saw appellant holding an axe handle in his right hand, raised above his head. Frausto got out of his car and told appellant to "get on the ground," but appellant instead went inside a room. He came out approximately 30 seconds later, without the axe handle. Frausto again ordered appellant to get on the ground, and this time appellant complied. The

4

officer then went into the room from which appellant had just exited, and found the axe handle in a corner of the room.

Ozell Littleton testified that he was employed as the manager of the motel when, at approximately 5:00 p.m. on July 17, 2009, he observed the following on a video monitor in his office at the motel: A group of approximately 10 to 15 people approached another group of approximately the same size "over by the stairs." Persons in both groups were "gesturing back and forth at each other," "obviously talking to each other." At one point, appellant, who "had a stick in his hand," "hit" Salyer.

Robert Hawkins testified to the following: He is a paramedic. He treated James Salyer on July 17, 2009. Salyer reported he was struck twice with a wooden axe handle, once to the back of the head and once to his left shoulder. Salyer also reported he injured his hand when he fell to the ground.

### Procedural Background

Appellant was represented at his jury trial and court trial by appointed counsel, attorney Mark Asami. Following these trials, appellant, in a letter to the trial court dated August 2, 2010, stated he was "seeking a granting on a new trial based on ineffective counseling by attorney" (*sic*), and asserted the following: (1) during jury selection, some prospective jurors "made comments on the defendants failure to testify," and as a result "there was a discriminating seed pla[]nted in ... the mind[s]" of jurors, thereby violating appellant's Fifth Amendment right against self-incrimination; (2) there were many "inconsistencies" in the testimony of prosecution witnesses; (3) some of that testimony "should have been excluded"; and (5) "nothing was proven beyond a reasonable doubt." (Unnecessary capitalization omitted.)

At the outset of the sentencing hearing on August 17, 2010, the court noted that it had received appellant's letter, and thereafter stated it needed additional time to consider issues related to sentencing, and continued sentencing to September 8, 2010. The court

5

sentenced appellant on that date. At that hearing, no mention was made of appellant's letter or any of the matters raised by appellant in that letter.

Appellant appealed. On appeal, this court held the trial court erred in failing to conduct a *Marsden* hearing, and remanded the matter, directing the court to conduct such a hearing.

On remand, a hearing was conducted on April 27, 2012, at which appellant and Asami appeared. The prosecutor was excluded. At the outset of the hearing, the court noted it had been directed to conduct a *Marsden* hearing, and stated "that's what we're going to do now," and invited appellant to speak. Appellant responded that in the letter he had written he was "asking for a new counsel" because he "wasn't getting a full ... representation," he "figured [Asami] didn't know [appellant's] case," "there was a lot of inconsistencies and stuff that shouldn't have been allowed into testimony," and "[m]y witnesses weren't put on the stand on my behalf, ... so that's why I wrote you ...." The court asked for names of the witnesses who were not called, and "What were theses witnesses going to show?" To this question and subsequent questions by the court, appellant gave a series of rambling responses that were, for the most part, directed at what he characterized as "a lot of things that [were] said [at trial] [were] inconsistent," but he did not tell the court what witnesses were not called and what their testimony would have been if called.

Subsequently, Asami, in response to questioning by the court, named seven persons from whom his investigator obtained statements prior to trial, and stated that he (Asami) "[a]t points ... was with the investigator" when these persons were interviewed. The named persons included Keith Thompson, who was called as a defense witness, and the following persons who Asami did not call as witnesses: Jennifer Ortiz, Cecilia Milton and Howard Stockard II. Asami explained: " ... whatever witnesses presented at trial were witnesses that we thought could help, but obviously there [were] many

6

witnesses I think here that were interviewed that we did not think were going to be very helpful to [appellant's] case. [¶] ... [M]any of [the persons interviewed], I did not feel were particularly helpful."

Appellant stated that the names Asami listed were the names of all the potential witnesses he (appellant) had given Asami. At that point, the court asked Asami to "summarize what these witnesses had to say in terms of [appellant]."

Asami responded first that Ortiz "was at the Fresno Inn," she saw appellant "speaking with [Boyd] at [Boyd's] room," she saw "the officers arrive," and "when the officer arrived," appellant "did not have anything in his hands."

Asami also stated that Cecilia Milton is appellant's wife and that she "recall[ed] [appellant] going over to [Boyd's] room to confront him about breaking into [Thompson's] room"; "[s]he does not think [appellant] had the stick when he went over to [Boyd's room]"; she saw "[Salyer] walk up to [appellant] and hit him," at which point "[appellant] hit [Salyer] with a stick he walks the dog with"; and "when the officers arrived, [appellant] did not have the stick and ... it was already in the room."

Asami also stated that Stockard stated the following: Stockard, after "he found out [appellant] was speaking with [Boyd] by [Boyd's] room," went to Boyd's room "to see what the problem was," knocked on the door and, when Boyd answered, asked Boyd "if everything was okay." Boyd "stated everything was fine ...." He "didn't look injured or upset at all."

Stockard further stated, according to Asami, the following: Stockard "began talking with Cindy," who he "characterized as [Salyer's] wife." He had "his back to [Salyer] and [appellant]," who "were talking and not angry." Appellant "was leaning on his stick he walks his dog with." Stockard "heard Cindy gasp and turned around towards [appellant] and [Salyer]" at which point Stockard "saw [Salyer] bleeding and [appellant] was holding onto the stick."

7

After Asami had summarized the statements obtained from all the persons he had previously listed,[4] the court, addressing appellant, stated: "Based on those statements it appears to me that the defense counsel in this case, through either himself or his investigator, talked to these witnesses, and I can't see any of that testimony that's helpful to you. Now do you see it otherwise and are there any."

At that point, appellant interrupted with another rambling response in which, as best we can determine, he questioned the evidence against him. However, he did not explain what testimony could have been offered that was not offered that would have been favorable to him.

## DISCUSSION

Appellant contends it was established at the *Marsden* hearing that three persons interviewed by the defense team—Jennifer Ortiz, Cecilia Milton and Howard Stockard II—could have provided testimony favorable to the defense; appellant's appointed counsel "provided ineffective assistance" by not calling these persons as witnesses at trial; this showing of ineffective assistance of counsel "was sufficient to support a motion for new trial," and therefore the court abused its discretion in denying appellant's *Marsden* motion. We disagree.

### Legal Background

Under *Marsden*, a defendant's Sixth Amendment right to the assistance of counsel entitles him to substitute appointed counsel """"if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective

---

**4** As discussed more fully below, appellant's argument on appeal is directed at Asami's failure to call as witnesses Ortiz, Milton and Stockard. Therefore, we do not summarize Asami's comments regarding the other persons interviewed.

8

representation is likely to result.'""" (*People v. Welch* (1999) 20 Cal.4th 701, 728 (*Welch*).)[5]

This standard applies regardless of whether the *Marsden* motion is made before or after trial. (*People v. Smith* (1993) 6 Cal.4th 684, 695 (*Smith*).) Thus, if the motion is made after trial, and if the "defendant satisfies the trial court that adequate grounds exist, substitute counsel should be appointed." (*Ibid*.) "Substitute counsel could then investigate a possible ... motion for new trial based upon alleged ineffective assistance of counsel. Whether, after such appointment, any particular motion should actually be made will, of course, be determined by the new attorney." (*Id*. at pp. 695-696.)

"The court should deny a request for new counsel at any stage unless it is satisfied that the defendant has made the required showing. This lies within the exercise of the trial court's discretion, which will not be overturned on appeal absent a clear abuse of that discretion." (*Smith*, *supra*, 6 Cal.4th at p. 696.)

"Once an attorney is appointed to represent a client, he assumes the authority and duty to control the proceedings. The scope of this authority extends to matters such as deciding what witnesses to call ...." (*People v. McKenzie* (1983) 34 Cal.3d 616, 631, disapproved on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 364-365.) "Whether to call certain witnesses is ... a matter of trial tactics, unless the decision results from unreasonable failure to investigate." (*People v. Bolin* (1998) 18 Cal.4th 297, 334.) ""Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" [Citations.] "[W]e accord great deference to counsel's tactical decisions" [citation], and

---

[5]     Appellant does not argue that the record shows that he and Asami had become embroiled in an irreconcilable conflict.

we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight" [citation].'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

*Analysis*

We address, in turn, appellant's arguments as to each of the three persons he claims Asami was remiss in not calling as a witness.

Appellant contends Jennifer Ortiz could have offered testimony favorable to appellant, specifically, "that she saw appellant talking to [Boyd] at his room, but she never saw a stick in his hands." However, the record does not support the claim that Ortiz "never" saw appellant holding a stick or axe handle.

The following colloquy ensued at the *Marsden* hearing after the court asked Asami to state what the persons interviewed had said to Asami and/or the defense investigator:

"MR. ASAMI: Jennifer Ortiz, she was at the Fresno Inn. She saw [appellant] speaking with [Boyd] at [Boyd's] room. She saw the officers arrive. [Appellant] did not have anything in his hands.

"THE COURT: Did not what?

"MR. ASAMI: Anything in his hands *when the officer arrived*." (Italics added.)

A fair reading of the foregoing is not that Ortiz *never* saw appellant empty-handed, but only that, by Ortiz's account, appellant was not holding the axe handle when the police arrived. Although this is at odds with Officer Frausto's testimony that appellant was holding an axe handle when he (the officer) drove into the motel parking lot, such testimony related to what occurred after the assaults. Thus, Asami reasonably could have concluded that Ortiz's testimony was far from crucial and would not have been particularly helpful to appellant.

Appellant also contends Cecilia Milton could have provided testimony favorable to the defense, citing Asami's statements that Milton stated, "She does not *think*

10

[appellant] had the stick when he went over to [Boyd's room]" and that Salyer hit appellant before appellant hit Salyer with a "stick." (Italics added.) We note first that evidence of what Milton thought, as opposed to what she saw, would be, if admissible at all, not particularly compelling. Moreover, although competent testimony that appellant acted in self-defense would have been favorable to appellant, Asami also indicated that Milton stated that appellant went to Boyd's room to "confront" him about breaking into Thompson's room. Such testimony would have provided some corroboration for Boyd's testimony as to the assault, and suggested that appellant harbored ill will toward Boyd when he went to Boyd's room. Given that Milton's testimony could well have included this unfavorable evidence, and the danger that the jury would have discounted Milton's defense-favorable testimony as biased, as coming from appellant's wife, Asami's decision to not present Milton as a defense witness was a rational tactical choice.

Finally, appellant faults Asami for not calling Howard Stockard II because, appellant asserts, Stockard could have testified that he (Stockard) "went to [Boyd's] room after appellant had been there, and [Boyd] told him everything was fine and he did not look hurt." This evidence would not have been particularly helpful to appellant. It was essentially consistent with Boyd's testimony that, after he was assaulted, he walked back to his room where his only response to his injuries was to apply ice to his shoulder. Moreover, Asami indicated Stockard also said that appellant was leaning on a stick as appellant and Salyer exchanged angry words, and that he turned and saw Salyer bleeding and appellant holding the stick. Such testimony would have been unfavorable to appellant, and Asami reasonably could have concluded that the risk of such evidence coming before the jury outweighed any possible benefit from other testimony Stockard might offer.

The record thus contains ample support for Asami's conclusion that calling Ortiz, Milton or Stockard would not have been helpful to the defense, and therefore it cannot be

11

said that "'""'the record clearly shows'"'"" that Asami was "'""'not providing adequate representation.'"'""  (*Welch*, *supra*, 20 Cal.4th at p. 728.)  The court did not err in denying appellant's *Marsden* motion.

## DISPOSITION

The judgment is affirmed.