Filed 8/27/13  P. v. Peck CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CURTIS DANIEL PECK,<br><br>    Defendant and Appellant. | F064868<br><br>(Super. Ct. No. VCF238092)<br><br>**OPINION** |

-------------------------

### THE COURT\*

APPEAL from a judgment of the Superior Court of Tulare County.  Kathryn T. Montejano, Judge.

Laurie Wilmore, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos Martinez and Jamie A. Scheidegger, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*        Before Cornell, Acting P.J., Franson, J. and Peña, J.

**INTRODUCTION**

In *People v. Peck* (Oct. 21, 2011, F061314) [nonpub. opn.], this court remanded appellant Curtis Daniel Peck's case for a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) because Peck had indicated dissatisfaction with counsel and the trial court failed to conduct a hearing. This appeal is from the trial court's denial of his *Marsden* motion after remand. Peck contends the trial court failed to make a satisfactory inquiry of his complaints and failed to determine whether his trial counsel properly advised him. We reject his contentions and affirm the judgment.

**FACTUAL AND PROCEDURAL SUMMARY**

On June 15, 2010, a homeowner found that his home had been burglarized and personal belongings taken. The homeowner saw Peck sitting in a vehicle outside his (homeowner's) home and approached; the homeowner saw one of his personal items in Peck's car. Peck fled, leaving the car behind when it got stuck.[1] Also on that day, another homeowner noticed that her home had been burglarized, personal property taken, and her car stolen. Peck was driving the stolen car when police began pursuit, the car overheated, and Peck was apprehended. Officers found stolen property inside the vehicle. At the time Peck committed the offenses, he was on parole.

On June 17, 2010, Peck was charged with two counts of first degree burglary (counts 1 and 2), one count of unlawful driving or taking of a vehicle (count 3), one count of evading an officer with willful disregard (count 4), one count of vandalism with over $400 in damages (count 5), and one count of resisting arrest (count 6). It also was alleged that Peck had a prior strike conviction, a prior serious felony conviction, and had served four prior prison terms.

---

[1]By order dated July 26, 2012, this court took judicial notice of the record in case No. F061314.

*Plea Hearing*

On June 25, 2010, while represented by Deputy Public Defender Roland Soltesz, Peck entered into a negotiated plea. Peck was present at that hearing. On that date the People were "dismissing the strike based on at this time proof problems" because it "appears that the People will not be able to prove that allegation." The People were dismissing both the prior strike allegation and the prior serious felony allegation. The People's offer was to reduce count 1 to a second degree burglary, with Peck to plead guilty or no contest to count 1, as amended, and to counts 2 through 5 as listed in the complaint, with count 6 to be dismissed at time of sentencing.

Pursuant to the offer, the maximum sentence Peck faced was 13 years; the stipulated sentence under the plea agreement was nine years. The trial court asked Peck, "do you know what that means" and "[d]id you discuss that with Mr. Soltesz," to which Peck nodded affirmatively and stated, "Yes, ma'am."

After a discussion of the calculation of the sentence, the trial court asked Peck, "do you have any questions before we go forward," to which Peck responded, "No, ma'am." The trial court then proceeded to explain the consequences of the plea and at the conclusion asked Peck, "Other than what I have told you regarding the consequences of your plea has anyone threatened you or promised you anything to get you to enter into this plea?" Again Peck responded, "No, ma'am."

At this point, the trial court asked Peck a series of questions. Peck was asked whether he used any medication or drugs that might affect his ability to understand the proceedings, to which Peck responded, "Never." Peck was asked, "Have you had sufficient time to discuss this case with your attorney," to which Peck responded, "Yes." Peck also was asked, "And are you satisfied with the services and the advice of your attorney?" Peck's response was "Yes."

After this series of questions, the trial court explained Peck's rights and accepted his waiver of those rights. The trial court then asked of Soltesz, "have you had sufficient

3.

time to discuss this case with your client?" Soltesz responded, "I have." The trial court specifically asked Soltesz if he had "advised [Peck] of the nature of the charges, the consequences of the plea and any possible defenses that he may have?" Soltesz responded, "Yes. We have talked about that."

The trial court asked Soltesz, "is it your belief that [Peck] fully understands these matters?" Soltesz replied, "It is." The trial court then asked Peck, "do you have any questions of me before we take your plea?" Peck replied, "No." After this, the trial court proceeded to accept Peck's change of plea pursuant to the plea agreement.

### Subsequent Proceedings

On July 28, 2010, the date set for sentencing, another attorney from the public defender's office appeared with Peck and stated Peck was "indicating there might have been ineffective assistance of counsel" and that Peck wanted to withdraw his plea. The trial court appointed conflict counsel instead of conducting a *Marsden* hearing. In case No. F061314, this court determined that appointment of conflict counsel was error; instead, the trial court should have conducted a *Marsden* hearing and we remanded the case for purposes of holding a *Marsden* hearing.

After remand, the *Marsden* hearing was held on March 8, 2012. During that hearing, Peck claimed he was dissatisfied with defense counsel's representation because "I went to the board and they gave me the paperwork that says what the cops said, what I said, things like that. There was a lot of stuff in there that wasn't explained to me." When asked if there was "anything that was not done that you think should have been done" in the preparation of his defense, Peck stated, "they should have had a mental health doctor come and speak to me." Peck also claimed that he and Soltesz "never got to talk," and that when he called the public defender's office to speak with another attorney that previously was assigned to the case before Soltesz, that attorney did not take his calls.

4.

The trial court responded to Peck: "In talking to you it sounds like you understand what we're talking about and are very clear and articulate about what you think should and should not be done; is that correct?" Peck responded, "Yes, ma'am." When asked by the trial court if he had "anything else that you'd like for me to consider," Peck responded that his mental health issues should have been brought up "prior to me taking the deal." When asked if he had ever been found incompetent, Peck responded, "No."

At this point, the trial court shifted its questioning to Soltesz. The trial court asked Soltesz whether at the time the plea was taken Peck had any trouble grasping what defense counsel was explaining to him and understood the discussion or whether there was any indication Peck was unable to form the intent necessary to commit the crimes with which he was charged. Soltesz indicated Peck understood what was being explained to him and there was no indication Peck was unable to form the requisite intent.

Soltesz explained that it was his understanding Peck had had "several in depth discussions with [a prior attorney] about the case" who was unavailable that day, so Soltesz covered the hearing. Soltesz explained the offer from the prosecution, told Peck that the prosecutor stated this was a "bottom line offer," and the choice was "to take the offer or go to trial." Soltesz stated Peck was "unhappy" with the offer and "wanted something less." Ultimately, Peck decided to take the offer because the prosecution had indicated it was their last best offer.

According to Soltesz, his conversation with Peck that day revolved around the "up and down side of taking or not taking the offer." There was never any indication that Peck did not understand what Soltesz was communicating and explaining.

When the trial court turned its attention again to Peck, he complained that Soltesz "answers what you say, only from what me and him talked about that day." The trial court reminded Peck that the only issue before the trial court was "whether or not it had been conveyed to [him] what the offer was, whether or not [he] understood and whether or not [he] entered into that plea voluntarily, knowingly, and intelligently."

5.

Peck responded that the "very first time I came into the courtroom they said they were going to strike me out." The trial court asked if this had been a part of the conversation; Soltesz replied that based upon Peck's record, he was not eligible for a 25-year-to-life sentence. Soltesz did not recall Peck asking "about that" when he was speaking with him on the day of the plea. The trial court noted that the case was filed as a "one strike" not a "three strikes" case.[2]

The trial court asked Soltesz if there were "any conflicts" between Peck and him when they were discussing the plea offer. Soltesz stated, "Peck wasn't in conflict with us but he was unhappy with what we were telling him." The trial court replied, "So are you saying that you and Mr. Peck did not have difficulty communicating and were not fighting but that he didn't like the answers?" Soltesz replied, "Yes."

The trial court confirmed with Soltesz that he and Peck had "a conversation what all the different options were," that Peck was able to "absorb the information," and that Peck was "disappointed in the possible options." When asked if he thought this was an accurate description of the conversation on the day of the plea, Peck responded, "Yes."

The trial court then noted, "I do not find that there was an embroilment." The trial court noted that "it appears" Peck received "in this particular matter appropriate communication with [his] attorney." When asked if there was anything else Peck wanted the trial court to consider, Peck asked that the "first lawyer" be brought in and asked the same questions.

The trial court responded that the communications regarding the plea offer had been between Peck and Soltesz, not any other attorney, and that Soltesz had never indicated to Peck that he faced a 25-to-life term if he went to trial. Soltesz confirmed that statement was "correct" to "the best of my recollection." Soltesz noted that he had

---

[2]Peck also asked this court to take judicial notice of his juvenile record. By order dated October 10, 2012, we deferred ruling on this request.

6.

"looked through the notes" and "[didn't] recall telling him that" because "from the nature of the charges, he wouldn't be eligible for that." Soltesz opined that the "offer that [Peck] got" was considerably lower than what he could have gotten."

The trial court ruled that "to the extent there are conflicts between the statements made during the hearing, this particular hearing I believe Mr. Soltesz." The trial court noted that Peck had been able to communicate clearly throughout the *Marsden* hearing and understand the *Marsden* proceedings; Peck clearly had communicated what his concerns were and why he felt he was not being properly represented; and there was no breakdown in the attorney-client relationship to the degree it impaired Peck's defense. The trial court denied the *Marsden* motion and found that Peck's entry of his plea had been knowing and intelligent.

## DISCUSSION

Peck contends the trial court's inquiry at the *Marsden* hearing was insufficient because the trial court did not determine whether defense counsel "properly investigated and advised him of potential enhancements and defenses, or presented mitigating mental health evidence during plea-bargaining." Peck identifies five discrete areas where he contends the trial court's inquiry regarding defense counsel's advice was inadequate: (1) Peck's mental health issues, (2) defenses to the charges, (3) validity of enhancements, (4) coercion of Peck's plea, and (5) adequate communication with Peck's counsel.

Contrary to Peck's contention, the record demonstrates the trial court made an adequate inquiry.

### *Standard of Review*

"We review a trial court's decision declining to relieve appointed counsel under the deferential abuse of discretion standard. [Citations.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1245 (*Jones*); see *People v. Silva* (2001) 25 Cal.4th 345, 367.) When a defendant seeks to discharge his or her appointed counsel and substitute another attorney, asserting inadequate representation, the trial court must permit the defendant to explain

7.

the basis of his or her contention and to relate specific instances of the attorney's inadequate performance. A defendant is entitled to relief if the record clearly shows the original appointed attorney is not providing adequate representation or that the defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Roldan* (2005) 35 Cal.4th 646, 681, overruled on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Fierro* (1991) 1 Cal.4th 173, 204.)

A judge abuses his or her discretion if the judge "denies a motion for substitution of attorneys solely on the basis of his [or her] courtroom observations, despite a defendant's offer to relate specific instances of misconduct," or makes a decision "without giving a party an opportunity to present argument or evidence …." (*Marsden, supra*, 2 Cal.3d at p. 124; *Jones, supra*, 29 Cal.4th at p. 1244.)

The relevant conduct and events prompting a defendant's request for new counsel may not be apparent to the judge from observations made in the courtroom. (*Marsden, supra*, 2 Cal.3d at p. 123.) The critical inquiry ordinarily relates to matters outside the trial record, e.g., whether the defendant had a defense that was not presented, whether counsel adequately investigated the facts, and whether the omissions charged to counsel resulted from inadequate preparation as opposed to a choice of trial tactics and strategy. (*Id.* at pp. 123-124.) "When a defendant moves for substitution of appointed counsel, the court must consider any specific examples of counsel's inadequate representation that the defendant wishes to enumerate." (*People v. Webster* (1991) 54 Cal.3d 411, 435.)

### *Mental Health Issues*

Peck first contends defense counsel was ineffective because he failed to investigate Peck's claim of mental health issues and the trial court failed to pursue this line of inquiry adequately at the *Marsden* hearing.

Here, the only evidence of Peck's alleged mental health issues was his own statements at the *Marsden* hearing that he suffered from some unspecified mental health

issue. Once Peck asserted that he had an unspecified mental health issue, the trial court made inquiries. The trial court elicited information from Peck that he had never been found incompetent; Soltesz indicated that Peck did not have any problem "grasping the case" or understanding what the two were discussing at the time the plea was entered. The trial court noted, and Peck acknowledged, that he had no trouble understanding the proceedings and articulating his position at the *Marsden* hearing. The transcript of the plea hearing reflects that Peck understood the proceedings and was not on any medication or other substance that would affect his comprehension.

A defendant is presumed to be mentally competent. (Pen. Code, § 1369, subd. (f); *Medina v. California* (1992) 505 U.S. 437, 448-453 (*Medina*).) The record establishes that whatever alleged unspecified mental health issue Peck claimed to be suffering from, it did not prevent him from understanding the proceedings, communicating with his counsel, or articulating his concerns, either at the time of the entry of his plea or during the *Marsden* hearing. Evidence of a mental illness and use of medication does not mean a defendant is unable to understand the proceedings and assist in a defense. (*People v. Smith* (2003) 110 Cal.App.4th 492, 502.)

The record reflects the trial court made sufficient inquiry into whether Peck's alleged mental health issue had any impact on his ability to communicate with defense counsel or knowingly and voluntarily enter into the plea agreement.

### *Alleged Defenses*

Peck's next contention is that defense counsel failed to investigate possible defenses, including that his mental health issues precluded him from forming the intent to commit a criminal act. He also contends the trial court failed to pursue this line of inquiry adequately.

When Peck raised this issue during the *Marsden* hearing, the trial court inquired of Soltesz whether Peck had ever indicated he did not have the intent to commit a crime when he entered the homes or was unable to form the intent to commit the offense. Upon

9.

inquiry from the trial court, Soltesz indicated Peck never stated, and nothing in Soltesz's observations or discussions with Peck led him to believe, that Peck was unable to form the requisite intent for the crimes. The trial court twice asked if there was anything else Peck wanted the trial court to consider; Peck did not raise any additional specifics in this regard.

Peck also claims he entered the homes merely to take a bath because he was homeless—this was a potential defense—and he asserts some of the facts in the case support his claim that he entered the homes only for the purpose of taking a bath. There is nothing in the record indicating that defense counsel was unaware at the time of entry of the plea of Peck's claimed intent only to bathe upon entry. Moreover, the facts of the case clearly support a conclusion that Peck had other motives for entering the homes: he took personal items from each home, including a vehicle, attempted to flee with those personal items, and tried to avoid arrest and escape custody while retaining those personal items.

Soltesz indicated he and Peck discussed the "up and down side" of taking the plea offer or going to trial, which presumably included weighing the relative merit of Peck's alleged defense in light of the independent facts showing Peck stole from each of the homes. "We do not find *Marsden* error where complaints of counsel's inadequacy involve tactical disagreements. [Citations.]" (*People v. Dickey* (2005) 35 Cal.4th 884, 922.) Peck's assertion that he entered the homes only to bathe and that defense counsel should have pursued this as a valid defense to the charges appears to be no more than a tactical disagreement.

The trial court made an adequate inquiry into Peck's alleged lack of intent, or inability to form intent, to commit the offenses.

### *Enhancements*

Peck contends he was told he faced a "three strikes" life sentence, which heavily influenced his decision to accept the plea offer, and he was never told of his potential

10.

sentencing exposure before accepting the plea offer. The record simply does not support these statements.

When the trial court asked Soltesz whether a discussion of a possible life sentence had been part of the discussions with Peck regarding the plea offer, Soltesz replied that he did not believe Peck was eligible to be sentenced as a "three strikes" offender based upon Peck's record, and Soltesz could not recall Peck asking about this possibility when they discussed the plea offer. Peck was not charged as a three strikes offender—the felony complaint is stamped "2 STRIKES." Soltesz had several years' experience handling felony criminal cases, demonstrated a familiarity with various sentencing factors, and was knowledgeable about Peck's prior convictions.[3] This certainly supports Soltesz's comment that he did not believe Peck was facing a potential three strikes or life sentence. Soltesz discussed "the reality of the options" with Peck. There is no indication that Soltesz's discussion with Peck involved erroneous information.

At the plea hearing, the People stated they were dismissing the strike allegation because "it appears that the People will not be able to prove that allegation." The People proceeded to articulate the plea offer and indicated that Peck was facing a potential maximum sentence of 13 years. The offer was for a nine-year sentence. After the People indicated they could not prove a prior strike conviction, followed by the People's articulation of the plea offer and the stipulated sentence, Peck was asked by the trial court if he had "any questions before we go forward." Peck responded, "No ma'am."

The People's inability to prove the strike prior and the potential exposure of a 13-year sentence was articulated at the commencement of the change of plea hearing, before Peck was asked whether he wanted to accept the People's plea offer. At the plea

---

[3]On July 31, 2013, Peck filed a request to augment the record on appeal with his juvenile record and file the documents under seal. By order dated August 9, 2013, we deferred ruling on this request.

11.

hearing, the trial court also asked if Peck had had sufficient time to discuss the plea offer with his attorney, to which Peck responded affirmatively.  The trial court also inquired of Peck whether, other than the consequences articulated by the trial court, anyone had "threatened" him with anything in order to "get you to enter into this plea?"  Peck responded that no one had.

Peck was provided ample opportunity to discuss the case and the plea with Soltesz prior to accepting the plea offer, and Soltesz did not believe Peck faced a three strikes sentence, nor could he recall that issue being discussed.  Peck had numerous instances where he was able to make inquiry of the trial court if he had any questions regarding the plea offer or his potential exposure prior to accepting the plea.  Peck specifically was asked if he had been threatened with any consequence, other than what had been articulated by the trial court, if he did not accept the plea.  Yet, it was not until the *Marsden* hearing, or at least after the entry of his no contest plea, that Peck first claimed he had been told he faced a three strikes sentence if he did not accept the plea offer.

There simply is no evidence in the record that Peck was under the impression he faced a three strikes sentence at the time he entered his plea, other than Peck's self-serving statement made at the *Marsden* hearing.

### *Alleged Coercion*

Peck contends his plea was not freely and voluntarily entered, but coerced, because he was induced to enter into the plea after being led to believe he faced a potential life sentence.  As noted above, there is no indication, other than Peck's self-serving statement, that he was ever led to believe he faced a potential life sentence if he failed to accept the plea.

At the *Marsden* hearing, Soltesz informed the trial court that on the day of the plea hearing, Peck understood what was being discussed with him about the charges against him and the plea offer.  Peck was "unhappy" about the offer and wanted "something less."  Soltesz conveyed to Peck that he would not be receiving a more favorable offer

from the prosecution.  Soltesz informed the trial court at the *Marsden* hearing that he believed Peck made a knowing, intelligent, and voluntary waiver of his rights and acceptance of the plea offer at the plea hearing.

The fact that the defendant may have been persuaded, or was reluctant, to accept a plea bargain does not demonstrate that the plea was involuntary.  (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 919; *People v. Hunt* (1985) 174 Cal.App.3d 95, 103; *People v. Urfer* (1979) 94 Cal.App.3d 887, 892.)  In other words, mere advice and persuasion by a defendant's own attorney does not suffice to vitiate the plea.  (*People v. Evans* (1960) 185 Cal.App.2d 331, 334.)

The judicial officer at the *Marsden* hearing noted that she had been the judicial officer that presided at the acceptance of plea hearing.  At the plea hearing, Peck was advised of all his rights before asking if he wished to waive them and accept the plea offer.  After making an inquiry of Peck and Soltesz at the *Marsden* hearing, the trial court found Peck's waiver of his rights and acceptance of the plea offer had been knowing and voluntary.

### Sufficient Communication

Peck's final contention is that he never had sufficient communication with his attorneys.  The record discloses otherwise, as the trial court elicited at the *Marsden* hearing.

When asked at the change of plea hearing, Peck confirmed he had had sufficient time to discuss the case with Soltesz and was satisfied with the services and advice of his attorney.  Consequently, we presume any dissatisfaction with the amount of time Peck had with his attorneys arose sometime after Peck accepted the plea offer, not before.

At the *Marsden* hearing, Peck complained that he and Soltesz "had a short brief talk," but whenever he tried to call the attorney handling the case prior to Soltesz, that attorney did not talk with him and he could not get his questions answered.  This complaint, however, fails to explain why Peck affirmed at the change of plea hearing that

13.

he had been afforded sufficient time to discuss the case with his attorney and was satisfied with the services rendered by his attorney. Nor does Peck explain why, if the attorney prior to Soltesz did not answer all his questions, he simply did not put these questions to Soltesz when they met before the change of plea. Peck also does not explain what questions he purportedly had that he was trying to get answered.

What is clear from the record is that Peck spoke with, or had the opportunity to speak with, both Soltesz and the prior counsel about the plea offer he ultimately accepted.

The plea offer ultimately accepted by Peck was not presented for the first time to Peck on the day of the change of plea; the offer had been communicated to Peck two days prior on June 23, 2010. During the June 23 hearing at which Peck was present, the prior attorney, Brian Schulte, informed the trial court that he had spoken with Peck about pending offers from the People and that Peck was considering one of the offers that included amending count 1 to second degree burglary, with a total stipulated nine-year sentence for the charges.

Both Peck and Soltesz stated at the *Marsden* hearing that they were able to have a conversation on the day of the plea hearing about all the different options and the plea offer.

The transcripts belie Peck's contention that he did not have adequate opportunity to communicate with his counsel and get his questions answered before accepting the plea offer.

The record demonstrates, and the trial court found, that there was no embroilment between Peck and his attorneys and no breakdown in the attorney-client relationship that impaired the defense.

### *Conclusion*

Mistake, ignorance, or any other factor overcoming the exercise of free judgment is good cause for withdrawal of a plea, but such good cause must be shown by clear and convincing evidence. (*People v. Nance* (1991) 1 Cal.App.4th 1453, 1456; *People v. Cruz*

14.

(1974) 12 Cal.3d 562, 566.)  Other factors overcoming a defendant's free judgment include inadvertence, duress, or fraud.  (*People v. Huricks* (1995) 32 Cal.App.4th 1201, 1208.)  On the other hand, postplea apprehension (buyer's remorse) regarding the anticipated sentence is not sufficient to compel the exercise of judicial discretion to permit withdrawal of the plea.  (*People v. Knight* (1987) 194 Cal.App.3d 337, 344.)  Nor can a plea be withdrawn simply because a defendant has changed his mind.  (*Huricks,* at p. 1208.)  When a nolo contendere plea is entered, as here, in exchange for dismissal of other counts and an agreed-upon maximum punishment, both parties must abide by the terms of the agreement.  (*People v. Panizzon* (1996) 13 Cal.4th 68, 80, citing *People v. Walker* (1991) 54 Cal.3d 1013, 1024.)

We have reviewed the record thoroughly and conclude Peck failed to show any deficiency in advisements and representation and failed to demonstrate that his plea was not made intelligently.  In light of the evidence against Peck, defense counsel's advice to accept the plea was not inappropriate.  On this record, we see no ineffective assistance of counsel.[4]

A careful review of Peck's complaints, the transcript of the June 23, 2010, hearing, the transcript of the plea hearing, and the statements elicited at the *Marsden* hearing reveal that Peck's concerns about his plea could be viewed as buyer's remorse because Peck was unhappy with the plea offer and apparently later regretted accepting the plea offer.  Buyer's remorse, or postplea apprehension, is not a sufficient ground for withdrawing a plea. (*Huricks, supra,* 32 Cal.App.4th at p. 1208 ["'[a plea may not be withdrawn simply because the defendant has changed his mind'"].)

---

[4]We will deny Peck's second request for judicial notice and his request to augment the record with his juvenile record.  These documents were not part of the superior court's record and are irrelevant to a determination of the issues on appeal.

15.

We conclude the trial court did not abuse its discretion in denying Peck's *Marsden* motion.

## DISPOSITION

The judgment is affirmed.  Peck's second request for judicial notice filed October 5, 2012, and his request to augment the record filed July 31, 2013, hereby are denied.

16.