Filed 12/6/13  P. v. Howard CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>　　v.<br><br>FRANK HOWARD,<br><br>　　　　Defendant and Appellant. | B241359<br><br>(Los Angeles County<br>　Super. Ct. No. BA368248) |

APPEAL from the judgment of the Superior Court of Los Angeles County. Frederick N. Wapner, Judge.  Affirmed.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, and Susan Sullivan Pithey, Deputy Attorney General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

A jury found defendant and appellant Frank Howard guilty of second degree murder. On appeal, defendant argues his trial counsel was ineffective in failing to request CALCRIM No. 3428, and in failing to object to improper statements by the prosecutor during closing argument. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In early 2010, defendant became acquainted with Sharon Brown. The two went out together a couple of times. On the evening of February 21, 2010, Ms. Brown called defendant and invited him over to the apartment of her mother, Billie Hall. Defendant drove over on his motorcycle. He and Ms. Brown then went out to pick up some food and alcohol. They returned to Ms. Hall's apartment, and the three of them sat in the living room talking, listening to music, drinking and smoking marijuana.

After a couple of hours, defendant and Ms. Brown retired to one of the bedrooms. After a period of time, the door to the bedroom suddenly opened and the covers were "snatched off" of them. Defendant leaped up and saw two men he did not know, both bigger than he was, standing in the room. They began yelling at him and punching him. A short fight ensued, with defendant eventually ending up on the ground in the corner of the room, bleeding from the forehead. Ms. Hall came into the room because of the commotion and tried to stop the fight. The two men then abruptly left the bedroom.

The men were Ms. Hall's boyfriend, Eddie Carroll, and his cousin, Craig Crenshaw. Mr. Carroll did not live with Ms. Hall, but usually stayed over at her apartment on weekends. Mr. Crenshaw sometimes went out with Ms. Brown. The two men had dropped by that Saturday evening much later than usual. On their way out of the apartment, Mr. Carroll, who still appeared angry, told Ms. Hall that he would talk to her later. She watched them get into Mr. Crenshaw's car and drive away.

Meanwhile, Ms. Brown and defendant got dressed. Ms. Brown went into the living room, where her mother had returned from outside. After going into the bathroom to look at the wound on his head, defendant joined the two women in the living room, sat down on one of the couches next to Ms. Brown and started putting on his boots. Ms. Brown told defendant he should leave, but he did not go.

2

After several minutes, Mr. Carroll returned. Defendant and Mr. Carroll briefly exchanged words. The encounter ended with defendant shooting Mr. Carroll twice in the upper back, and then once again in the head on his way out of the apartment. Running down the apartment stairs, defendant saw two men, Willie Herbert and Jason Conant, and pointed his gun at them as he passed by. Defendant then left on his motorcycle.

Sometime later the next day, defendant voluntarily turned himself in to the police. During an interview with the investigating detective, defendant admitted he had been in Ms. Hall's apartment, that he had been attacked by two unknown men, that they left saying something about getting a gun, and then one of them returned and defendant shot him. Defendant said he shot Mr. Carroll after he re-entered the apartment and pushed Ms. Hall to the ground. Defendant explained that when he tried to step over Mr. Carroll to leave the apartment, Mr. Carroll grabbed his pant leg and defendant "squeezed off another one" and then left.

Defendant was charged by amended information with one count of murder for the death of Mr. Carroll (Pen. Code, § 187, subd. (a); count 1),[1] and two counts of assault with a firearm for his encounters with Mr. Herbert and Mr. Conant in the stairwell (§ 245, subd. (a)(2); counts 2 & 3). It was also specially alleged as to count 1 that defendant personally used and discharged a firearm in the commission of the offense, and caused great bodily injury and death. (§ 12022.53, subds. (b), (c) & (d).) It was specially alleged as to counts 2 and 3 that defendant personally used a handgun in the commission of the assaults. (§ 12022.5, subd. (a).) Defendant pled not guilty and denied the special allegations.

The case proceeded to a jury trial in April 2012. Ms. Brown, Ms. Hall, Mr. Crenshaw and Mr. Conant[2] testified to the events that occurred on the evening of February 21, 2010, at the Hall apartment. The witnesses largely testified consistently as to the material facts regarding the events that led up to the shooting. Most of the disputed

---

[1]     All further undesignated section references are to the Penal Code.

[2]     Mr. Herbert had passed away before trial.

3

evidence concerned the specifics of the shooting itself. Ms. Brown said she ran out of the apartment after the first shot was fired and could not attest in great detail to what occurred.

Ms. Hall testified that when Mr. Carroll came back, he and defendant exchanged words and defendant said something like "so you guys want to jump somebody." She said Mr. Carroll was turning to leave when defendant shot him and Mr. Carroll immediately dropped to the ground. Ms. Hall said when defendant stepped over Mr. Carroll's body on his way out of the apartment, he pointed the gun down and shot him one more time.

Mr. Conant testified to hearing a lot of yelling and commotion in the apartment, shots being fired, and then defendant passed him and Mr. Herbert in the stairwell, pointing a gun at them as he left the building.

The prosecution also presented Dr. Lisa Scheinin, the deputy medical examiner who performed the autopsy on Mr. Carroll. She attested that Mr. Carroll died from multiple gunshots wounds, two in the upper back and one in the right temple area. Dr. Scheinin expressed her opinion the two gunshot wounds to the back occurred first (one was almost near the left armpit area), and that the head wound in the temple was suffered last. Dr. Scheinin explained the wound track for the head wound showed minimal blood, most reasonably explained by the fact Mr. Carroll had already suffered extensive blood loss from one of the wounds to the back that had damaged numerous organs, including the heart. Dr. Scheinin also stated her opinion that the gunshot to the head occurred at very close range because of soot around the entrance wound.

Defendant testified on his own behalf and also presented the testimony of Dr. Nancy Kaser-Boyd, a clinical forensic psychologist. Defendant attested to being attacked in the bedroom and hearing one of the men say "I'm gonna get a gun" as they left the bedroom. He said both of the men, whom he did not know, were bigger than he was and he was therefore not very "effective" in fighting them off.

Defendant explained he had been attacked and robbed by three men some 20 years earlier. He had suffered serious wounds, including head wounds, and was hospitalized

4

for a long period of time. Defendant said he did not trust people easily, but that he had basically "got[ten] over it, you know. Life goes on, you know. I learned to live with it."

Defendant said he did not immediately leave the apartment as he felt "dazed [and] confused." He explained that Mr. Carroll then returned a few minutes later, still "tanked" up. Mr. Carroll pushed Ms. Hall to the ground and defendant believed he saw him reaching for a gun in his waistband, so he shot him. As he attempted to leave the apartment, defendant stepped over Mr. Carroll. Just as he did so, defendant said Mr. Carroll grabbed his pant leg and the gun went off again. He then ran down the stairs, past two men, telling them he just wanted to leave. Defendant got on his motorcycle and drove off, but ditched his motorcycle shortly thereafter because both tires had been slashed. He also got rid of the gun. On cross-examination, defendant was asked about various inconsistencies in his statements to the police and his statements in court.

Dr. Kaser-Boyd testified she administered various tests to defendant approximately a year after the incident. In her opinion, the test results indicated defendant suffers from posttraumatic stress disorder (PTSD). She explained that PTSD causes individuals to be hypervigilant to threats and unusually defensive.

According to Dr. Kaser-Boyd, the test results did not indicate defendant was malingering. However, on cross-examination, she conceded defendant had scored high on one of the three criteria used to assess whether an individual is exaggerating or malingering. She stated the leading researcher on PTSD would consider defendant's score to be a "red flag." But, Dr. Kaser-Boyd did not believe, based on the overall test results and defendant's life experiences, that defendant was malingering.

Dr. Kaser-Boyd also admitted that in responding to one of the tests (the DAPS), defendant identified the shooting incident and arrest as his most traumatizing event and not the attack 20 years prior. Defendant's responses were therefore not reflective of feelings or symptoms of PTSD before the shooting, but rather, were a result of the shooting. Dr. Kaser-Boyd stated she was told there were no mental health records for defendant, nor any previous PTSD diagnosis. Nevertheless, she believed, based on his life experiences and the test results, that he suffered from PTSD.

5

The jury acquitted defendant of first degree murder, and of the two assault counts. The jury convicted defendant of the second degree murder of Mr. Carroll, and found true all of the firearm allegations related to that offense. The court sentenced defendant to an aggregate state prison term of 40 years to life, consisting of a 15-year-to-life term on the murder count, plus a 25 year-to-life term on the firearm enhancement pursuant to section 12022.53, subdivision (d). The court imposed and stayed statutory terms on the other two firearm enhancements. Defendant was awarded 820 days of presentence custody credits and ordered to pay various fines and fees.

This appeal followed.

## DISCUSSION

Defendant's sole contention on appeal is that he was denied his constitutional right to the effective assistance of counsel at trial, specifically that (1) counsel failed to request CALCRIM No. 3428, and (2) counsel failed to object to improper statements by the prosecutor during closing argument.

The burden is on defendant to establish ineffective assistance by a preponderance of the evidence. (*People v. Ledesma* (1987) 43 Cal.3d 171, 218.) To do so, a defendant "must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687-696 (*Strickland*).)

On direct appeal, as here, this burden can be stringent. When the record on appeal " ' "sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," *the claim on appeal must be rejected*.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding." (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 (*Mendoza Tello*), italics added; *People v. Jones* (2003) 29 Cal.4th 1229,

6

1254 (*Jones*) [ineffective assistance claim properly resolved on direct appeal only where record affirmatively discloses no rational tactical purpose for counsel's actions].)

Our Supreme Court has cautioned that, if not for this standard, "appellate courts would become engaged 'in the perilous process of second-guessing.' [Citation.] Reversals would be ordered unnecessarily in cases where there were, in fact, good reasons for the aspect of counsel's representation under attack. Indeed, such reasons might lead a new defense counsel on retrial to do exactly what the original counsel did, making manifest the waste of judicial resources caused by reversal on an incomplete record." (*People v. Pope* (1979) 23 Cal.3d 412, 426.)

## 1. CALCRIM No. 3428

CALCRIM No. 3428 provides in relevant part as follows: "You have heard evidence that the defendant may have suffered from a mental [disorder]. You may consider this evidence only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted [or failed to act] with the intent or mental state required for that crime. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant acted [or failed to act] with the required intent or mental state." Defendant contends he was entitled to the CALCRIM No. 3428 instruction because of his defense that he did not form the requisite intent for murder because of PTSD symptoms he was suffering at the time.

Defendant concedes the court did not have a sua sponte duty to instruct the jury with CALCRIM No. 3428. (See *People v. Larsen* (2012) 205 Cal.App.4th 810, 824 (*Larsen*) ["CALCRIM No. 3428 is a pinpoint instruction that must be given only if requested by the defendant, and only if substantial evidence supports the defense theory that defendant's mental disease or disorder affected the formation of the relevant intent or mental state."]; accord, *People v. Saille* (1991) 54 Cal.3d 1103, 1119; *People v. Ervin* (2000) 22 Cal.4th 48, 91 [holding the same as to CALJIC No. 3.32, the equivalent of CALCRIM No. 3428].) As defendant correctly states, pinpoint instructions need only be given *if specifically requested by counsel* and supported by substantial evidence. (*Saille*, *supra*, at p. 1119.)

7

Defendant's contention is that defense counsel was ineffective because she failed to request CALCRIM No. 3428, despite the fact that substantial evidence, including the expert testimony of Dr. Kaser-Boyd, had been presented which supported the defense and provided a basis upon which the jury could have concluded that defendant had not formed the requisite intent for murder in any degree. Defendant argues that since it was not disputed he shot Mr. Carroll, the key to his defense was the intent with which he pulled the trigger, whether in justifiable self-defense or at least with a mental state lacking malice so as to reduce the offense to manslaughter.

We recognize the crux of the defense was defendant's intent at the time of the shooting. However, we do not agree that we can determine in this appeal that defense counsel's decision not to request CALCRIM No. 3428 amounted to conduct below the standard of what would be expected of a reasonably competent attorney acting as a diligent advocate. To the contrary, the record presents several reasonable explanations for why defense counsel may have made the tactical decision to not focus the jury on the PTSD defense.

In opening statement, defense counsel told the jury the evidence would show that defendant is responsible for causing the death of Mr. Carroll, but the shooting was justified as an act of self-defense, or at worst, was manslaughter, but not murder. Defense counsel requested jury instructions (CALCRIM Nos. 505, 522, 570, 571, 580, 625) focused on self-defense, imperfect self-defense, heat of passion, and voluntary intoxication as the most likely bases upon which the jury would either acquit defendant or find him guilty only of manslaughter.

During trial, defense counsel presented the expert testimony of Dr. Kaser-Boyd. However, on cross-examination, Dr. Kaser-Boyd conceded that defendant had never previously been diagnosed with PTSD, and had tested high in one category of testing criteria for malingering. She explained that given her overall examination of defendant she did not believe he was malingering, but admitted that the leading PTSD researcher would consider defendant's high score a "red flag." Dr. Kaser-Boyd also admitted that the test results were focused on defendant's mental health state one year after the

8

incident, and based on defendant's responses to test questions focused on stressors he felt because of, and since, the shooting and his subsequent arrest, *not* before. Given this testimony, the trial court would have been justified in denying the instruction even if it had been requested. (See *People v. Panah* (2005) 35 Cal.4th 395, 484-485 [rejecting claim of error in trial court refusal to give CALJIC No. 3.32 – the equivalent of CALCRIM No. 3428 – where expert testimony was only that the defendant was diagnosed with some sort of psychosis more than 24 hours after the crime, but no substantial evidence of mental disorder prior thereto].)

Defendant, in his own testimony, downplayed the significance of the attack he had suffered 20 years earlier, stating that he had "[gotten] over it." And, in closing argument, defense counsel told the jury "[t]his isn't about PTSD. It isn't about some psycho voodoo stuff that's going on." Counsel then went on to explain that it was about common sense emotions, that defendant had been in a vulnerable, intimate moment with Ms. Brown when he was suddenly attacked, and then had believed he was still facing a threat and reacted to that threat. Counsel focused the jury on self-defense and imperfect self-defense.

In our view, defense counsel had several reasonable bases supporting a decision to downplay the PTSD testimony, in which defendant's credibility had been attacked, and to argue more vigorously for self-defense or imperfect self-defense. Counsel's failure to request CALCRIM No. 3428 could have fairly "resulted from an informed tactical choice within the range of reasonable competence" and the ineffective assistance claim must therefore fail. (*People v. Padilla* (2002) 98 Cal.App.4th 127, 136 (*Padilla*); accord, *Mendoza Tello*, *supra*, 15 Cal.4th at pp. 266-267; *Jones*, *supra*, 29 Cal.4th at p. 1254.)

As a practical matter, even if we were to assume, for the sake of argument, that counsel's failure to request the instruction was below the standard of care, defendant has not affirmatively shown the second required element of an ineffective assistance claim: prejudice.

The omission of CALCRIM No. 3428 could not have misled the jury as to the intent element of any of the charged crimes or the lesser included offenses. The jury

instructions as a whole correctly stated the applicable law and instructed on the necessary elements. CALCRIM No. 3428 "does not delineate or describe an element of an offense. Rather, it is a pinpoint instruction relating particular facts to a legal issue in the case." (*Larsen*, *supra*, 205 Cal.App.4th at p. 830.)

The jury was properly instructed about assessing the testimony of expert witnesses like Dr. Kaser-Boyd. Nothing in the instructions intimated to the jury that it should discount defendant's evidence regarding PTSD, nor precluded the jury from fairly assessing that evidence in its deliberations related to defendant's mental state.

The jury was also given numerous relevant instructions on which it could have decided to either acquit defendant or reduce the first degree murder charge to second degree (which it did), or to manslaughter, including CALCRIM No. 505 regarding self-defense, which was modified to focus the jury on the fact it could consider that Mr. Carroll had assaulted and threatened defendant before the shooting; CALCRIM Nos. 522 and 570 regarding the concepts of provocation, sudden quarrel and heat of passion; CALCRIM No. 571 regarding imperfect self-defense; CALCRIM No. 580 regarding involuntary manslaughter; and CALCRIM No. 625 regarding voluntary intoxication.

Finally, there was strong, arguably overwhelming, evidence of defendant's guilt of murder. The medical examiner's testimony was uncontradicted that Mr. Carroll was shot in the back, and then shot one final time at close range in the temple. Ms. Hall testified Mr. Carroll never moved again after the initial shots in the back which caused him to collapse to the floor, that he had been heading out of the apartment at the time he was shot, and did not have a gun or act like he was reaching for one. This evidence, which the jury apparently found credible, contradicted defendant's testimony that he shot in fear, that Mr. Carroll was facing him at the time and acting aggressively, and that the final shot to the temple occurred because the gun went off accidentally as he was trying to leave the apartment and thought Mr. Carroll grabbed at him.

To summarize, defendant has not shown a more favorable outcome would have been likely if the jury had been instructed with CALCRIM No. 3428. (*Larsen*, *supra*,

10

205 Cal.App.4th at pp. 833-834 [failure to give CALCRIM No. 3428 not error in light of "forceful" evidence against the defendant, propriety of instructions given to jury, and because the defendant was not denied right to present mental disorder evidence]; see also *People v. King* (2010) 183 Cal.App.4th 1281, 1312 [given overwhelming evidence against the defendant, it was not reasonably probable defendant would have obtained a better outcome in the absence of counsel's errors]; *Padilla*, *supra*, 98 Cal.App.4th at p. 137 [strength of prosecution evidence negated reasonable probability the defendant would have obtained a more favorable outcome with the pinpoint instruction].)

## 2. Prosecutorial Misconduct

Defendant contends the prosecutor made improper statements during closing argument, specifically that he misstated the law related to heat of passion. "When a defendant believes the prosecutor has made remarks constituting misconduct during argument, he or she is obliged to call them to the court's attention by a timely objection. Otherwise no claim is preserved for appeal." (*People v. Morales* (2001) 25 Cal.4th 34, 43-44.) Defendant contends his trial counsel failed to make any objection to the prosecutor's improper statements, thus forfeiting defendant's ability to cure the improper argument at the time of trial which caused the jury to be confused on an important defense, and also depriving him of appellate review. Defendant contends such failures constitute ineffective assistance.

Defendant cites the following statement by the prosecutor as objectionable: "I told you why this is a first degree murder, a murder plus. Right? I told you why this is not a voluntary manslaughter, a murder minus. This is definitely not a situation where you find that [defendant's] actions were justified. A reasonable person would not have acted this way. It's not heat of passion because you're looking at it from an average person. Would an average person shoot someone in that situation? No." The prosecutor, while correctly reading the elements of the heat of passion instruction, also said: "So the question is would a person of average disposition, your average person, would they have shot Mr. Carroll in that situation[?] . . . Would an average person have shot Mr. Carroll dead under those circumstances?"

11

Defendant contends the same type of argument was deemed improper in *People v. Najera* (2006) 138 Cal.App.4th 212. *Najera* explained that with the defense of heat of passion, "[t]he focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Id*. at p. 223.) We find nothing improper in the prosecutor's argument. The prosecutor argued the circumstances would not have caused a reasonable person to act rashly, *not* that defendant responded irrationally to circumstances that would have enraged a reasonable person.

In any event, failure to object to evidence or argument " 'rarely constitutes constitutionally ineffective legal representation . . . .' [Citation.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 252; see also *People v. Ghent* (1987) 43 Cal.3d 739, 772-773 [rejecting contention counsel's failure to object during prosecutor's closing argument amounted to ineffective assistance because counsel "may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments"]; *People v. Beagle* (1972) 6 Cal.3d 441, 458, superseded by statute on other grounds as stated in *People v. Rogers* (1985) 173 Cal.App.3d 205, 208-209 [failure to make certain objections to evidence ordinarily within realm of trial tactics over which court will not engage in "judicial hindsight"]; *People v. Zimmerman* (1980) 102 Cal.App.3d 647, 658 [failure to object to evidence ordinarily "held insufficient to establish an unconstitutional impairment of the right to effective counsel"].)

## DISPOSITION

The judgment of conviction is affirmed.


                                                        GRIMES, J.

We concur:


        BIGELOW, P. J.                          RUBIN, J.


12